**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BISHOP PAIUTE TRIBE,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>INYO COUNTY; WILLIAM LUTZE,<br>Inyo County Sheriff; THOMAS<br>HARDY, Inyo County District<br>Attorney,<br>*Defendants-Appellees*. | No. 15-16604<br><br>D.C. No.<br>1:15-cv-00367-<br>GEB-JLT<br><br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Jr., District Judge, Presiding

Argued and Submitted April 21, 2017
San Francisco, California

Filed July 19, 2017

Before: Sidney R. Thomas, Chief Judge, Mary H.
Murguia, Circuit Judge, and Michael M. Baylson,[*] District
Judge.

Opinion by Judge Murguia

---

[*] The Honorable Michael M. Baylson, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

## SUMMARY[**]

### Federal Question Jurisdiction / Ripeness

The panel reversed the district court's dismissal on jurisdictional grounds of an action brought by an Indian tribe, seeking a declaration regarding the tribe's right to conduct law enforcement on its reservation.

The panel held that because the tribe had alleged violations of federal common law, it had adequately pleaded a federal question providing the district court with subject matter jurisdiction under 28 U.S.C. § 1331.

The panel held that the case was constitutionally and prudentially ripe because there was an actual and imminent threat to a concrete interest of the tribe, and the case was fit for judicial decision. In addition, the case was not moot.

The panel remanded the case to the district court for further proceedings.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Dorothy A. Alther (argued), California Indian Legal Services, Escondido, California; Jasmine Andreas, California Indian Legal Services, Bishop, California; for Plaintiff-Appellant.

John D. Kirby (argued), Law Offices of John D. Kirby, San Diego, California; Marshall S. Rudolph, Inyo County Counsel, Independence, California; for Defendants-Appellees.

**OPINION**

MURGUIA, Circuit Judge:

The Bishop Paiute Tribe (the "Tribe") seeks a declaration that they have the right to "investigate violations of tribal, state, and federal law, detain, and transport or deliver a non-Indian violator [encountered on the reservation] to the proper authorities." Before reaching this issue, the district court dismissed the case on jurisdictional grounds, concluding that the case presents no actual case or controversy. On appeal, we are also asked to assess whether the district court had subject matter jurisdiction over this case. Because questions of federal common law can serve as the basis of federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and because this case presents a definite and concrete dispute that is ripe and not moot, we reverse and remand for further proceedings.

# I. BACKGROUND

## A. Factual History[1]

The Tribe is a federally recognized Indian Tribe with an 875-acre reservation near the city of Bishop in the County of Inyo, California. The Tribe exercises powers of self-government through its governing body, the Tribal Council, which consists of five officers elected from the general tribal membership. The Tribe has approximately 1,800 persons living on the reservation and runs a casino that allegedly has received approximately 450,000 visitors.

The Tribe has established civil but not criminal tribal law and has enacted three civil ordinances that are relevant to this case: a Nuisance Ordinance, a Trespass Ordinance, and a Tribal Public Safety Ordinance. Section 201 of the Tribal Public Safety Ordinance permits the tribal court to issue and enforce protective orders for the purposes of preventing violence or threatening acts. Section 202 of the Tribal Public Safety Ordinance permits the tribal court to give full faith and credit to valid protective orders issued by a state or another tribe's tribal court.

In 2009, the Tribe established a Tribal Police Department ("Tribal PD"). Since that time, the Tribal PD has responded to several hundred calls. Many of the responses are completed along with the Inyo County Sheriff's Department ("ICSO"). The Tribal PD employs

---

[1] We take the following facts from the allegations in the first amended complaint ("FAC"), which we must assume to be true. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (explaining that at this stage of the proceedings, "[w]e accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party").

three officers and a Chief of Police. Each officer must meet various qualification requirements, including having two years of law enforcement experience and completing a law enforcement training class. The Tribal PD patrols the reservation, enforces tribal ordinances, and conducts investigations. Tribal PD General Order 3.1 states that a Tribal PD officer may need to detain an Indian or non-Indian individual to secure the scene, prevent the suspect from leaving the scene, or for officer safety. Tribal PD officers are also permitted to detain non-Indians who are suspected of committing criminal acts on the reservation and to transfer such individuals to outside law enforcement. Non-Indians are to be turned over to outside law enforcement as soon as possible.

On December 24, 2014, Tribal PD Officer Daniel Johnson ("Johnson") received an on-reservation call from a tribal member reporting that the tribal member's non-Indian ex-wife was violating the tribal member's tribal and state protective orders by being at his home and causing a disturbance. Johnson notified the ICSO about the incident and responded to the call. Tribal and local law enforcement knew the suspect well; Tribal PD had responded to 11 calls involving the suspect, and ICSO had previously arrested the suspect twice for violating the state protective order.

Once Johnson arrived at the scene, he approached the suspect, who was sitting in her vehicle. Johnson informed the suspect that she was violating tribal and state court protective orders and that she needed to leave. The suspect became angry and verbally abusive. Johnson informed her that he was going to detain her for violating the protective ordinances and that she would be cited for violating the tribal nuisance and trespass ordinances. Johnson repeatedly ordered the suspect to exit the vehicle, but she did not. As

Johnson attempted to remove her from the vehicle, the suspect kicked him. In response, Johnson removed his Taser and warned the suspect that if she did not comply, Johnson would deploy his Taser. The suspect did not comply, and Johnson applied his Taser to her.

Moments after Johnson deployed his Taser, an ICSO deputy arrived. Several neighbors, who had gathered around Johnson and the suspect, were verbally abusive toward Johnson. The ICSO deputy requested assistance from the police department of the nearby city of Bishop, California, because he and Johnson were outnumbered and the neighbors were hostile. Johnson finally removed the suspect from the vehicle and handcuffed her. Soon thereafter, a Bishop City Police Detective and ICSO Acting Lieutenant and Detective arrived at the scene and conducted an investigation. The officers ultimately released the suspect, because her ex-husband did not want her to be arrested. Johnson, however, cited the suspect for trespass, nuisance, and violating the tribal and state protective orders.

Before leaving the scene, the ICSO detective noticed a small abrasion and some redness on the suspect's abdominal area and asked the suspect if she was injured. Johnson asked the suspect if she wanted an ambulance to respond, and the suspect declined the offer. The following week, the ICSO conducted an investigation into the December 24 incident that was submitted to the Inyo County district attorney's office. On January 5, 2015, the Inyo County district attorney filed a felony complaint against Johnson charging him with assault with a stun gun, false imprisonment, impersonating a public officer, and battery.

On January 6, 2015, ICSO Sheriff William Lutze ("Sheriff Lutze") sent a "Cease and Desist Order" to the Tribe ordering Tribal PD to "cease and desist all law

enforcement of California statutes." The order stated that ICSO had repeatedly told Tribal PD that its officers had been illegally exercising state police powers and that Tribal PD officers "do NOT have any legal authority, notwithstanding Bishop Paiute tribal authority, to enforce any state or federal laws within or outside tribal property." The order documented several instances of the Tribal PD allegedly illegally exercising law enforcement authority, including the December 24, 2014 incident with Johnson. ICSO ordered Tribal PD to immediately:

> (A) cease and desist the unlawful exercise of California peace officer authority both within and outside tribal property and (B) cease and desist possessing firearms outside tribal property (e.g. court appearances) and (C) provide this office with prompt written assurance within ten (10) days that Tribal Police will cease and desist from further acts as explained in this correspondence.
>
> If Tribal Police does not comply with this cease and desist order within this time period, be advised that Tribal Police employees will be subjected to **arrest and criminal prosecution** for applicable charges as well as Penal Code § 538d (Fraudulent Impersonation of a Peace Officer).

(emphasis in original).

The Tribe responded to the cease and desist order on January 15, 2015. The Tribe noted that it disagreed with ICSO's presentation of the facts and interpretation of applicable law but, as a show of good faith, the Tribe agreed

that its officers would "not exercise California peace officer authority on or off the reservation" and would "carry their firearms only on the Bishop Paiute Indian Reservation." The Tribe did not suggest that its officers would refrain from exercising their inherent authority as interpreted by the Tribe. The Tribe further noted the importance of Tribal PD officers being "allowed to perform their legal duties without fear or expectation of criminal prosecution" and therefore requested a meeting with ICSO to address the matters identified in the cease and desist letter.

## B. Procedural History

The Tribe brought this action against Inyo County, Sheriff Lutze, and Inyo County District Attorney Thomas Hardy (collectively "Defendants"). Attached to the operative first amended complaint ("FAC") were several exhibits, including Johnson's felony arrest warrant and criminal complaint, the cease and desist order, various tribal ordinances, Tribal PD officer job descriptions, and Tribal PD policies and procedures.

In its FAC, the Tribe requested that the district court clarify the Tribe's rights with respect to the ongoing dispute with the Defendants. In particular, the Tribe sought declarations that:

> [1] Defendants' actions of arresting and charging Tribal Officer Johnson and future threat of criminal prosecution of the Tribe's police officers, violates federal common law and directly interferes with the Tribe's inherent authority to maintain a police department and protect public safety on its Reservation.

[2] [T]he Tribe's police officers have the authority on its Reservation to stop, restrain, investigate violations of tribal, state and federal law, detain, and transport or deliver a non-Indian violator to the proper authorities. By carrying out these federally authorized actions, the Tribe's duly authorized law enforcement officers are not impersonating a state officer nor is their restraint, investigation and detention of a non-Indian, in compliance with provisions of the Indian Civil Rights Act, an "arrest" for purposes of a state criminal charge of false imprisonment.

The Tribe also sought to enjoin Defendants from arresting, criminally charging, interfering with, or threatening Tribal PD officers who exercise their lawful duties. Finally, the Tribe sought attorney fees and costs.

The three defendants each separately moved to dismiss the FAC. After the motions were fully briefed, counsel for Defendants filed a declaration stating that he recently learned that the Tribe had responded to ICSO's cease and desist order. Defendants' counsel attached the Tribe's letter and stated that the letter "appears to address and resolve the directives of the Sheriff's letter" and that the letter "raises the issue of mootness of this litigation, and subject matter jurisdiction, as well as accompanying justiciability, and further speaks to and underscores the issue of ripeness, as well as the issue of existence of an actual case or controversy." The Tribe filed an "Opposition" to the declaration, arguing that the Tribe's case "is not moot and presents a case and controversy."

On July 13, 2015, the district court, stating that it could consider jurisdictional issues sua sponte, dismissed the FAC for lack of a justiciable case or controversy. *Bishop Paiute Tribe v. Inyo Cty.*, No. 1:15-CV-00367-GEB-JTL, 2015 WL 4203986, at \*1, \*4 (E.D. Cal. July 13, 2015). The Tribe timely appealed.[2]

## II. STANDARD OF REVIEW

We review de novo a district court's order dismissing a case for lack of subject matter jurisdiction, lack of ripeness, or for mootness. *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1039 (9th Cir. 2011) (subject matter jurisdiction); *Mfr'd Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1025 (9th Cir. 2005) (ripeness); *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (mootness).

---

[2] Under Federal Rule of Civil Procedure 41(b), dismissals for lack of jurisdiction are generally without prejudice and are therefore not final appealable orders. However, determining whether a ruling is final and therefore appealable under 28 U.S.C. § 1291 requires "a practical rather than a technical" analysis. *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964) (citation omitted). We have held that "[a] ruling is final for purposes of § 1291 if it (1) is a full adjudication of the issues, and (2) clearly evidences the judge's intention that it be the court's final act in the matter." *Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 846 (9th Cir. 2009) (citation omitted). Here, we have little doubt that the judge intended his order to be his final act in this case. The order and the docket state that "this action is DISMISSED for lack of jurisdiction and shall be closed." *Bishop Paiute Tribe*, 2015 WL 4203986, at \*4. The district court thereafter issued a Judgment. And the district court did not hint at future proceedings or the filing of a second amended complaint. We therefore conclude that the district court's order was a final appealable order.

## III. DISCUSSION

The district court's order and the parties' briefing raise two main questions. First, Defendants argue on appeal that the court lacks subject matter jurisdiction because the FAC does not present a question of federal law. Second, the Tribe argues that the district court improperly dismissed the case on ripeness grounds because the district court erred in concluding that the Tribe brought a pre-enforcement challenge against a "law" without pleading a concrete plan to violate the law. Relatedly, the Tribe argues that the district court improperly dismissed the case on mootness grounds because the district court erroneously concluded that the Tribe had agreed to comply with ICSO's cease and desist order. We agree with the Tribe on all counts: we have subject matter jurisdiction over the Tribe's claims, which are ripe and not moot.

### A.  Subject Matter Jurisdiction

"The party asserting jurisdiction bears the burden of establishing subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *Id.* at 984–85. Under 28 U.S.C. § 1331, federal "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Questions of federal common law present a federal question that can serve as the basis of federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("[Section] 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin."); *see also*

*Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 714 (9th Cir. 1980) (citing *Illinois*, 406 U.S. at 100 (noting that this principle applies in the context of federal Indian law)).

The Tribe alleged in the FAC that the district court had jurisdiction based on 28 U.S.C. §§ 1331, 1362, 2201, and 2202. Of these provisions, the most important is 28 U.S.C. § 1331, because the Tribe clearly alleges violations of federal common law. The Tribe specifically alleges that "[t]he Defendants' arrest and charging of Tribal officer Johnson . . . violates federal common law." The Tribe alleges that federal common law grants the Tribe the authority to "investigate violations of tribal, state, and federal law, detain, and transport or deliver a non-Indian violator to the proper authorities."[3] Because the Tribe has alleged violations of federal common law, the Tribe has adequately pleaded a federal question that provides federal courts with subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See Gila River*, 626 F.2d at 714.

Defendants offer several unpersuasive arguments that the FAC fails to adequately establish subject matter jurisdiction. First, Defendants argue that "the Tribe completely fails to identify" which law this case arises under. Defendants' assertion is simply wrong. In its FAC,

---

[3] Though we need not reach the merits of this claim to conclude that the Tribe has properly alleged federal subject matter jurisdiction, we note that the Tribe has at least a colorable claim for relief. *See, e.g.*, *Duro v. Reina*, 495 U.S. 676, 697 (1990) (superseded by statute on other grounds); *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975) (holding that "Indian tribes possess an inherent sovereignty," which includes the power "to exclude trespassers who have violated state or federal law by delivering the offenders to the appropriate authorities").

the Tribe provided a long list of Supreme Court and other relevant case law regarding the Tribe's alleged inherent authority to exercise jurisdiction over non-Indians on a reservation.[4]  The Tribe explicitly alleged that Defendants violated federal common law under this line of cases.

Second, Defendants argue that the Indian Law Enforcement Reform Act of 1990 ("ILERA"), 25 U.S.C. §§ 2801 *et seq.*, and its accompanying federal regulations, 25 C.F.R. §§ 12.21 *et seq.*, have displaced the federal common law upon which the FAC relies.  Congress can displace federal common law through legislation.  *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423 (2011).  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speaks directly to the question at issue."  *Id.* at 424 (citation and alterations omitted).  Defendants argue that the ILERA speaks directly "to the question which is at issue here – that of tribal law enforcement officers enforcing federal law on reservations."

However, Defendants confuse what the Tribe is seeking in this case.  Defendants argue that the ILERA speaks directly to the question of whether and to what extent tribal law enforcement officers can *enforce* federal law.  That question is distinct from what the Tribe actually seeks: a declaration that the Tribe may investigate violations of tribal, state, and federal law and *detain and deliver* a non-Indian potential violator to state law enforcement authorities.  The Tribe is not seeking a declaration that it can enforce

---

[4] For example, the Tribe cites *Duro*, *Montana v. United States*, 450 U.S. 544 (1981), *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), *Ortiz-Barraza v. United States*, 512 F.2d 1176 (9th Cir. 1975), and *Williams v. Lee*, 358 U.S. 217 (1959).

federal law on the reservation or that it can prosecute violators of federal or state criminal law. Essentially, Defendants fail to show how the ILERA comprehensively or directly addresses the *inherent* tribal police authority that the Tribe seeks to exercise over non-Indians. As Defendants themselves point out, the ILERA establishes a program through which the Bureau of Indian Affairs offers training to tribal law enforcement officers who wish to exercise *federal* peace officer powers. The Tribe is not seeking such authority in this case. Moreover, Defendants point to no case in which a court has concluded that ILERA displaces the alleged federal common law right of tribes to detain and deliver to the proper authorities a non-Indian suspected of violating tribal, state, or federal law on tribal property.

For these reasons, we hold that the FAC raises a federal question that provides federal courts with subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## B. Justiciability

Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases or controversies. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution."). In this case, the two most relevant justiciability doctrines are ripeness and mootness.

### 1. Ripeness

Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not "issue advisory opinions [or] declare rights in hypothetical

cases." *Id.* A proper ripeness inquiry contains a constitutional and a prudential component. *Id.*

### a. Constitutional Ripeness

For a case to be ripe, it must present issues that are "definite and concrete, not hypothetical or abstract." *Id.* at 1139 (citation omitted). Constitutional ripeness is often treated under the rubric of standing because "ripeness coincides squarely with standing's injury in fact prong." *Id.* at 1138 ("Sorting out where standing ends and ripeness begins is not an easy task.").[5] For a plaintiff to meet the injury-in-fact prong of standing, the plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted).

Here, the Tribe identifies its legally protected interest as its "inherent sovereign authority to restrain, detain, and deliver to local authorities a non-Indian on tribal lands that is in violation of both tribal and state law." This interest is certainly concrete and particularized. *See Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 836–37 (9th Cir. 2012). As the matter currently stands, the Tribe has been ordered to cease and desist exercising what it believes to be its proper inherent authority. The Tribe has already seen one of its officers arrested and prosecuted based on Defendants' interpretation of the Tribe's lawful authority. *See id.* (finding that plaintiffs alleged a concrete injury because the statute at issue had already been enforced

---

[5] The "irreducible constitutional minimum of standing" includes (1) an injury in fact; (2) causation; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

against them, "thereby eliminating any concerns that Plaintiffs' fear of enforcement is purely speculative"). Since the Tribe covers the legal costs of defending its Tribal PD officers from prosecution, this dispute has cost the Tribe money. And Defendants' interference with the Tribe's alleged inherent authority has, according to Tribe, interfered with the Tribe's ability to maintain peace and security on the reservation. *See id.*

Moreover, in addition to the actual arrest and prosecution of Johnson, the ICSO's cease and desist letter credibly threatens imminent future prosecutions if the Tribe fails to abide by ICSO's demand. While generalized threats of prosecution do not confer constitutional ripeness, a genuine threat of imminent prosecution does. *Thomas*, 220 F.3d at 1139. To determine whether a genuine threat of imminent prosecution exists,

> we look to whether the plaintiffs have articulated a concrete plan to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute.

*Id.* (citation omitted). Here, the Inyo County district attorney's office has already prosecuted one Tribal PD officer, and ICSO communicated a specific threat of additional prosecutions.

Because the arrest and ongoing prosecution of Johnson and the cease and desist order threatening future prosecutions demonstrate that the threat to the Tribe's concrete interest is actual and imminent, we hold that the

Tribe's FAC alleges an injury in fact that meets the requirements of constitutional ripeness.

### b.  Prudential Ripeness

Our evaluation of "the prudential aspects of ripeness" is "guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Thomas*, 220 F.3d at 1141 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  "Prudential considerations of ripeness are discretionary."  *Id.* at 1142.  In determining whether a case is fit for judicial decision, this court has looked to whether the case presents a "concrete factual situation" or purely legal issues.  *Id.* at 1141–42; *see also San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996).

Here, the FAC presents a detailed factual account of the underlying disputes in this case, including the arrest and ongoing prosecution of Johnson and the ongoing dispute over the scope of the Tribe's lawful sovereign authority. Withholding the court's consideration and resolution of these disputes creates multiple hardships for the Tribe, including ongoing legal costs, intrusions on the Tribe's ability to keep the peace and security of the reservation, misunderstanding and confusion surrounding the ability of the Tribe and Tribal PD to enforce tribal laws and prevent lawlessness on the reservation, and potentially an unlawful limitation on the Tribe's inherent sovereign powers.  This case is clearly fit for judicial decision.  *See Oklevueha*, 676 F.3d at 837–38 (finding prudential ripeness because "seizure of Plaintiffs' marijuana presents a concrete factual scenario that demonstrates how the laws, as applied, infringe

Plaintiffs' constitutional rights" (citation and alterations omitted)).

The Tribe has presented a prudentially ripe case or controversy. Because the case is constitutionally ripe as well, we hold that the district court erred by concluding that this case was not ripe.

### 2. Mootness

The final issue is whether this case is moot in light of the Tribe's response letter, in which ICSO contends that the Tribe agreed to abide by the cease and desist letter. The district court relied on the Tribe's letter in concluding that there was no ongoing controversy.

A federal court lacks jurisdiction to hear a case that is moot. *Carson*, 347 F.3d at 745. A case is moot "where no actual or live controversy exists." *Id.* (citation omitted). "If there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction." *Id.* (citation omitted). Mootness has been described as "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* (citation omitted).

Here, the district court erred by concluding that the Tribe's response letter to the cease and desist order mooted any ongoing controversy. The letter makes clear that the Tribe disagreed with ICSO's letter and order. The Tribe specifically stated "[w]e disagree with your presentation of the facts, and your interpretations of applicable law." But the Tribe agreed to address ICSO's concerns "as a show of good faith and to keep the peace." This letter in no way demonstrates that the controversy over the scope of the

Tribe's lawful sovereign authority was put to rest.  In fact, the Tribe requested further meetings with ICSO to address ICSO's concerns.   And the Tribe specifically noted the importance of Tribal PD officers being "allowed to perform their legal duties without fear or expectation of criminal prosecution."  The district court's conclusion that the Tribe's response letter mooted all controversies between the parties was erroneous.  *See Carson*, 347 F.3d at 745 (explaining that mootness occurs "where no actual or live controversy exists" (citation omitted)).

## IV. CONCLUSION

Because the district court has subject matter jurisdiction over claims involving federal common law and because the Tribe's case is ripe and not moot, we **REVERSE** and **REMAND** for further proceedings.