**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAN CLARK; TAMI DUNLAD; ALI HASSAN; JENNIFER IMMEL; GARY KUNZE; ELISABETH LOWE; DALE MONTZ; ABDI MOTAN; FREDRICK RICE; MICHAEL RIEBS; FIREW TESHOME,

*Plaintiffs-Appellants*,

v.

CITY OF SEATTLE; SEATTLE DEPARTMENT OF FINANCE AND ADMINISTRATIVE SERVICES; FRED PODESTA, in his official capacity as Director of the Seattle Department of Finance and Administrative Services,

*Defendants-Appellees.*

No. 17-35693

D.C. No. 2:17-cv-00382-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Senior District Judge, Presiding

Argued and Submitted February 5, 2018
Seattle, Washington

Filed August 9, 2018

Before:  MILAN D. SMITH, JR. and MARY H. MURGUIA, Circuit Judges, and EDUARDO C. ROBRENO,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

SUMMARY[**]

**Labor Law**

The panel affirmed the district court's dismissal as unripe of an action brought by for-hire drivers, challenging a Seattle ordinance that establishes a multistep collective-bargaining process between "driver-coordinators," such as Uber Technologies and Lyft, Inc., and for-hire drivers who contract with those companies.

The drivers contended that the ordinance was preempted by §§ 8(b)(4) and 8(e) of the National Labor Relations Act and that the ordinance violated the drivers' First Amendment rights.

The panel held that the drivers' NLRA claims were constitutionally unripe because they did not allege an injury in fact that was concrete and particularized. The panel concluded that disclosure of the drivers' personal information to a union was neither a concrete nor a

---

[*] The Honorable Eduardo C. Robreno, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

particularized injury. Further, no contract governing the manner in which the drivers did business with Uber or Lyft was imminent, and the drivers did not show that they would be subject to a coercive union campaign in violation of § 8(b)(4).

The panel held that the drivers' First Amendment claim was unripe for the same reasons.

## COUNSEL

William L. Messenger (argued) and Amanda K. Freeman, National Right to Work Legal Defense Foundation Inc., Springfield, Massachusetts; James G. Abernathy, Freedom Foundation, Olympia, Washington; for Plaintiffs-Appellants.

P. Casey Pitts (argued), Peder J. Thoreen, Stacey M. Leyton, and Stephen P. Berzon, Altshuler Berzon LLP, San Francisco, California; Josh Johnson, Sara O'Connor-Kriss, Michael K. Ryan, and Gregory C. Narver, Assistant City Attorneys; Peter S. Holmes, City Attorney; Seattle City Attorney's Office, Seattle, Washington; for Defendants-Appellees.

Deborah J. La Fetra, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

Catherine L. Fisk, Berkeley, California; Charlotte Garden, Fred T. Korematsu Center for Law & Equality, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington, for Amici Curiae Labor Law Professors.

**OPINION**

M. SMITH, Circuit Judge:

In December 2015, the Seattle City Council passed Ordinance 124968, an Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers (Ordinance). *Chamber of Commerce of the U.S. v. City of Seattle*, 890 F.3d 769, 775 (9th Cir. 2018). The Ordinance establishes a multistep collective-bargaining process between "driver coordinators," such as Uber Technologies (Uber) and Lyft, Inc. (Lyft), and for-hire drivers who contract with those companies. *Id.*

Plaintiffs-Appellants Dan Clark, Tami Dunlap, Ali Hassan, Jennifer Immel, Gary Kunze, Elisabeth Lowe, Dale Montz, Abdi Motan, Fredrick Rice, Michael Riebs, and Firew Teshome (collectively, the Drivers), are for-hire drivers who contract with Uber and Lyft. Together, the Drivers filed suit against Defendants-Appellees the City of Seattle, the Seattle Department of Finance and Administrative Services (the Department), and the Department's Director, Fred Podesta (collectively, the City), challenging the Ordinance on federal law grounds. On appeal, the Drivers contend that the Ordinance is preempted by sections 8(b)(4) and 8(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158, and that the Ordinance violates the Drivers' First Amendment rights.

The district court dismissed the Drivers' action as unripe, without reaching the merits of the Drivers' claims. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Ordinance[1]

The Ordinance establishes a complex collective-bargaining process between driver coordinators and for-hire drivers.[2]  Seattle, Wash., Ordinance 124968 § 1(I).  The process begins with the election of a "qualified driver representative" (QDR).  Seattle, Wash., Municipal Code §§ 6.310.110, 6.310.735(C).  An entity seeking to represent for-hire drivers operating within Seattle first applies to the Director for designation as a QDR.  *Id.* § 6.310.735(C).  The entity must submit its application within thirty days of the "commencement date" promulgated by the Director.  *Id.* The Director then provides the entity with written notice of his determination within fourteen days of the application.  *Id.*

Within fourteen days of its designation as a QDR, the QDR notifies the driver coordinator of its intent to represent that driver coordinator's for-hire drivers.  *Id.* § 6.310.735(C)(2).  After receiving notice from the QDR, the driver coordinator must, within seventy-five days of the commencement date, disclose to the QDR the names, addresses, email addresses, and phone numbers of all of its "qualifying drivers."  *Id.* § 6.310.735(D).  To be a qualifying driver, a for-hire driver must have "dr[iven] at least 52 trips originating or ending within the Seattle city limits for a particular Driver Coordinator during any three-month period

---

[1] Our discussion of the Ordinance is adapted from our decision in *Chamber of Commerce*, 890 F.3d 769.

[2] The Ordinance defines a "driver coordinator" as "an entity that hires, contracts with, or partners with for-hire drivers for the purpose of assisting them with, or facilitating them in, providing for-hire services to the public."  Seattle, Wash., Municipal Code § 6.310.110.

in the 12 months preceding the commencement date." Seattle, Wash., Qualifying Driver and Lists of Qualifying Drivers, Rule FHDR-1.

The QDR contacts the qualifying drivers to solicit their interest in being represented by the QDR. Seattle, Wash., Municipal Code § 6.310.735(E). The QDR then submits to the Director signed statements of interest from qualifying drivers indicating that they wish to be represented by the QDR in negotiations with the driver coordinator. *Id.* § 6.310.735(F)(1). The QDR must submit the statements of interest to the Director within 120 days of receiving the qualifying drivers' contact information. *Id.*

The Director then makes a determination within thirty days of receiving the statements of interest. *Id.* § 6.310.735(F)(2). If a majority of qualifying drivers consent to representation by the QDR, the Director certifies the QDR as the "exclusive driver representative" (EDR) for all for-hire drivers for that particular driver coordinator. *Id.* If more than one QDR is able to demonstrate that a majority of qualifying drivers wish to be represented by that QDR, the Director will designate the QDR with the largest number of statements of interest to be the EDR. *Id.*

If no QDR has successfully garnered the support of a majority of qualifying drivers, the Director will announce that no QDR has met the threshold for EDR certification. *Id.* § 6.310.735(F)(3). In the event no EDR is certified for a driver coordinator, "the Director shall, upon the written request from a designated QDR or from an entity that seeks to be designated as a QDR, promulgate a new commencement date applicable to that driver coordinator that is no later than 90 days after the request." *Id.* § 6.310.735(G). Following the promulgation of a new commencement date, the QDR, or another entity that wishes

to be designated as the EDR, will then repeat the steps outlined above. *Id.* In any event, the Ordinance provides that "no driver coordinator shall be subject to the [EDR certification] requirements of Section 6.310.735 more than once in any 12-month period." *Id.*

After the Director certifies the EDR,

> the driver coordinator and the EDR shall meet and negotiate in good faith certain subjects to be specified in rules or regulations promulgated by the Director, including, but not limited to, best practices regarding vehicle equipment standards; safe driving practices; the manner in which the driver coordinator will conduct criminal background checks of all prospective drivers; the nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers; minimum hours of work, conditions of work, and applicable rules.

*Id.* § 6.310.735(H)(1). In the event they reach an agreement, the driver coordinator and the EDR submit the agreement to the Director for review. *Id.* § 6.310.735(H)(2). The Director reviews the agreement for compliance with the Ordinance and Chapter 6.310 of the Seattle Municipal Code, which governs taxicabs and for-hire vehicles. *Id.* In conducting his review, the Director may seek and consider additional evidence, including by conducting public hearings or requesting more information from the parties. *Id.*

The agreement becomes final and binding on all parties only if the Director finds the agreement compliant. *Id.* § 6.310.735(H)(2)(a). The agreement does not take effect

until the Director makes an affirmative compliance determination. *Id.* § 6.310.735(H)(2)(c). If the Director deems the agreement noncompliant, the Director remands it to the parties with a written explanation of the agreement's failures, and may offer recommendations for remedying the agreement's inadequacies. *Id.* § 6.310.735(H)(2)(b).

If the driver coordinator and the EDR fail to reach an agreement within 90 days of the EDR's certification, "either party must submit to interest arbitration upon the request of the other," in accordance with the procedures and criteria specified in the Ordinance. *Id.* § 6.310.735(I). The interest arbitrator then proposes an agreement compliant with Chapter 6.310 and the City's public policy goals. *Id.* § 6.310.735(I)(2). The interest arbitrator's proposed agreement undergoes the same review process as an agreement proposed by the parties. *Id.* § 6.310.735(I)(3).

The Ordinance also specifies various amendment procedures that may be invoked after an agreement becomes final. The parties may propose amendments to an approved agreement, subject to the Director's review and approval. *Id.* § 6.310.735(J). The Director can withdraw approval of an agreement during its term if the Director finds that the agreement no longer complies with the Ordinance or furthers the City's public policy goals. *Id.* § 6.310.735(J)(1). Finally, an EDR may be decertified through a driver-initiated petition process. *Id.* § 6.310.735(L).

## B.  The Drivers

The Drivers are for-hire drivers who contract with Uber. Two of the Drivers, Clark and Lowe, also contract with Lyft. All of the Drivers, with the exception of Clark and Dunlap, are qualifying drivers under the terms of the Ordinance. The Drivers object to the Ordinance and the prospect of

representation by Teamsters Local 117 (Local 117): They do not wish to become members of, or be represented by, Local 117, and they do not wish to be bound by any future agreement Local 117 may reach with Uber or Lyft.

## C. Procedural History

Because the present case has proceeded in parallel with the Chamber of Commerce of the United States of America's (the Chamber) lawsuit challenging the same Ordinance, we briefly recount the procedural history of both cases.

After the Ordinance took effect on January 22, 2016, the Chamber filed suit on March 3, 2016, challenging the Ordinance as preempted by the Sherman Antitrust Act and the NLRA. The district court dismissed the Chamber's action as unripe, because no entity had as yet applied for certification as a QDR. *See Chamber of Commerce of the U.S. v. City of Seattle*, No. C16-0322RSL, 2016 WL 4595981, at *2, *4 (W.D. Wash. Aug. 9, 2016).

On March 3, 2017, the Director designated Local 117 as a QDR. On March 7, 2017, Local 117 notified Uber, Lyft, and ten other driver coordinators that it intended to seek EDR certification for those companies. Local 117 requested the contact information of the driver coordinators' qualifying drivers pursuant to the Ordinance's disclosure provisions. In response, the Chamber quickly filed suit again on March 9, 2017, seeking a declaration that the Ordinance is unenforceable, and a preliminary injunction enjoining the City from enforcing the Ordinance.

The Drivers filed the present action on the heels of the Chamber's refiling. On March 10, 2017, the Drivers filed a Complaint challenging the Ordinance primarily on federal labor law and First Amendment grounds. In their

Complaint, the Drivers asserted five claims: (1) that the Ordinance is preempted by NLRA section 8(e); (2) that the Ordinance is preempted by NLRA section 8(b)(4); (3) that the Ordinance is preempted under a *Garmon* theory because it regulates conduct regulated by NLRA sections 8(b)(4) and 8(e), and/or preempted under a *Machinists* theory because it regulates conduct Congress intended to be left to the free play of economic forces; (4) a 42 U.S.C. § 1983 claim that the Ordinance violates the First and Fourteenth Amendments; and (5) that the Ordinance is preempted by the Drivers' Privacy Protection Act.[3]  The Drivers sought a declaration that the Ordinance is unlawful, an injunction enjoining the City from enforcing the Ordinance, and damages.

On March 21, 2017, the City filed a motion to dismiss the Chamber's case.  On April 4, 2017, before ruling on the City's motion to dismiss the Chamber's case, the district court granted the Chamber's motion for a preliminary injunction.  After the district court granted the Chamber's motion for a preliminary injunction, it denied as moot the Drivers' motion for a preliminary injunction.

On April 13, 2017, the City moved to dismiss the Drivers' Complaint.

On August 1, 2017, the district court granted the City's motion to dismiss the Chamber's case.  The district court entered judgment on August 4, 2017.  The Chamber timely appealed.

---

[3] The Drivers have waived their Drivers' Privacy Protection Act claim on appeal because they did not raise it in their opening brief.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1137 n.13 (9th Cir. 2012) (stating that issues not raised in an opening brief are waived).

On August 24, 2017, the district court granted the City's motion to dismiss the Drivers' case. The Drivers timely appealed.

On August 28, 2017, the Chamber filed an emergency motion for an injunction pending appeal in this court. On September 8, 2017, we granted the emergency motion and enjoined enforcement of the Ordinance pending the Chamber's appeal. After we granted the Chamber's motion for a preliminary injunction pending appeal, the Drivers withdrew their motion for a preliminary injunction.

On May 11, 2018, we reversed in part, affirmed in part, and remanded the Chamber's case for further proceedings. *Chamber of Commerce of the U.S.*, 890 F.3d at 776.

## STANDARD OF REVIEW

We review de novo a district court's order dismissing a case for lack of subject matter jurisdiction. *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1151 (9th Cir. 2017). We have a "continuing, independent obligation" to ensure that we have subject matter jurisdiction over a case. *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031 (9th Cir. 2013).

## ANALYSIS

## I.  The Drivers' NLRA Preemption Claims Are Unripe.

Article III of the Constitution empowers us to adjudicate only "live cases or controversies," not "to issue advisory opinions [or] to declare rights in hypothetical cases." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). Ripeness is one of the justiciability doctrines that we use to determine whether a case presents a live case or controversy. "[R]ipeness is 'peculiarly a

question of timing,' designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (citation omitted) (first quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974); then quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). "Although ripeness, like other justiciability doctrines, is 'not a legal concept with a fixed content or susceptible of scientific verification,' the Supreme Court has observed that the doctrine 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Id.* (citation omitted) (first quoting *Poe v. Ullman*, 367 U.S. 497, 508 (1961); then quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). Thus, in conducting a traditional ripeness inquiry, we evaluate both "a constitutional and a prudential component."[4] *Bishop Paiute Tribe*, 863 F.3d at 1153.

---

[4] The Supreme Court recently cast doubt on the prudential component of ripeness in *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014). The Court suggested, but did not decide, that once a court "conclude[s] that [a plaintiff] ha[s] alleged a sufficient Article III injury," any remaining prudential ripeness concerns do not render a plaintiff's claim nonjusticiable: "To the extent [a defendant] would have us deem [a plaintiff's] claim[] nonjusticiable 'on grounds that are "prudential," rather than constitutional,' '[t]hat request is in some tension with our recent reaffirmation of the principle that "a federal court's obligation to hear and decide"' cases within its jurisdiction "is virtually unflagging."'" *Id.* at 2347 (last alteration in original) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014)). Finding that the prudential ripeness factors were "easily satisfied" in the case, the Court declined to "resolve the continuing vitality of the prudential ripeness doctrine" in *Susan B. Anthony List*. *Id.* Here, we similarly need not decide this issue. As we explain, the Drivers do not satisfy the constitutional component of ripeness.

"For a case to be ripe, it must present issues that are 'definite and concrete, not hypothetical or abstract.'" *Id.* (quoting *Thomas*, 220 F.3d at 1139). Because "[s]orting out where standing ends and ripeness begins is not an easy task," *Thomas*, 220 F.3d at 1138, "[c]onstitutional ripeness is often treated under the rubric of standing because 'ripeness coincides squarely with standing's injury in fact prong,'" *Bishop Paiute Tribe*, 863 F.3d at 1153 (quoting *Thomas*, 220 F.3d at 1138). Given that "the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline." *Thomas*, 220 F.3d at 1138.

We thus turn to the well-established requirements for an injury in fact: A "plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete *and* particularized.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). For an injury to be concrete, it must "'actually exist[]'; in other words, it is 'real, and not abstract.'" *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018) (quoting *Spokeo*, 136 S. Ct. at 1548). "Intangible harms and a 'risk of real harm' can be sufficiently concrete." *Id.* (quoting *Spokeo*, 136 S. Ct. at 1549).

The Drivers have not satisfied any of these requirements. The Drivers offer three reasons for why their NLRA preemption claims are constitutionally ripe. We reject each of them.

First, the Drivers argue that the Ordinance "will infringe on their privacy rights, as several Drivers' personal information will be disclosed to the Teamsters under the Ordinance's disclosure provisions." The Drivers assert that harm is imminent, because the injunction pending in the *Chamber of Commerce* case is the sole bulwark halting the disclosure of their information to Local 117. The Drivers' argument is flawed. Even assuming *arguendo* that the disclosure is imminent, the disclosure of the Drivers' personal information is neither a concrete nor a particularized injury.

To start, the Drivers do not identify the legal wellspring of their claimed privacy rights. Nor do they show how the disclosure of the information presents a "risk of real harm" to each Driver "personal[ly] and individual[ly]." *Spokeo*, 136 S. Ct. at 1548–49 (quoting *Lujan*, 504 U.S. at 560 n.1); *see also Or. Prescription Drug Monitoring Program v. DEA*, 860 F.3d 1228, 1233 (9th Cir. 2017) ("[S]tanding is not dispensed in gross," but instead "requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted." (first quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008); then quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014))). Indeed, the Drivers' own conduct belies their assertion of injury: In order to operate in the City of Seattle, all for-hire drivers must obtain business licenses and disclose much of the same

information in a public and searchable municipal database online as must be disclosed pursuant to the Ordinance. *See* Seattle, Wash., Municipal Code §§ 6.208.010, 6.310.130(F).[5]  Moreover, even if the Drivers could identify a basis for their claimed privacy rights, "a bare procedural violation, divorced from any concrete harm," does not "satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S. Ct. at 1549–50 ("It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.").  Where, as here, there is not only a lack of any concrete harm, but also a lack of any predicate legal violation, the injury-in-fact requirement is not satisfied.

Second, the Drivers argue that "certification of an exclusive driver representative will result in a contract governing the manner in which [they] can do business with Uber and/or Lyft."  In other words, the Drivers assert that they are poised to suffer a violation of NLRA section 8(e). Such an injury is neither actual nor imminent.  Section 8(e), by its plain language, requires a "contract or agreement":

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any

---

[5] Licensees' names, addresses, and phone numbers are publicly available at http://www.seattle.gov/business-licenses-and-taxes/find-a-licensed-business.

> contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void
>
> . . . .

29 U.S.C. § 158(e). Here, no contract or agreement is imminent. No QDR has successfully procured the support of the majority of either Uber or Lyft's qualifying drivers. It is speculative whether Local 117, another entity, or no entity at all, will become the EDR for Uber and Lyft's drivers. With no EDR in sight to reach an agreement with either Uber or Lyft, the Drivers' assertion of a section 8(e) injury is wholly speculative. We thus reject the Drivers' second injury-in-fact theory.

Third, the Drivers argue that "the Ordinance's certification process will violate the Drivers' federal right under Section 8(b)(4) not to be subject to union *campaigns* prohibited by that statute." NLRA section 8(b)(4) provides, in relevant part:

> It shall be an unfair labor practice for a labor organization or its agents . . .
>
> (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> > (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees . . . .

*Id.* § 158(b)(4)(ii)(A)–(B). The Drivers observe correctly that section 8(b)(4) does not require a union to achieve an agreement or contract proscribed by section 8(e). Rather, conduct with the "object" of achieving a forbidden agreement—even if such an agreement is never attained— falls within the proscriptive ambit of section 8(b)(4). *Id.*

However, the plain language of the statute makes clear that not just any conduct will trigger section 8(b)(4)'s proscription: The conduct must be "threaten[ing], coerc[ive], or restrain[ing]." *Id.*; *see also Overstreet v. United Bhd. of Carpenters, Local Union No. 1506*, 409 F.3d 1199, 1212 (9th Cir. 2005) (explaining that "[a] § 8(b)(4)(ii)(B) violation has two elements," the first of which is that "a labor organization must 'threaten, coerce, or restrain' a person engaged in commerce (such as a customer walking into [a] secondary business[])" (quoting 29 U.S.C. § 158(b)(4)(ii))). The Supreme Court has made clear that "more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568,

578 (1988) (holding that a union's distribution of handbills at the entrances of a shopping mall was not threatening, coercing, or restraining within meaning of section 8(b)(4) because there had been "no violence, picketing, or patrolling," and "no suggestion that the leaflets had any coercive effect on customers of the mall"); *see also Int'l Longshoremen's Union, Local 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012, 1018 (9th Cir. 1985) (requiring "'proof which if viewed realistically tends to show' a coercive effect" for a section 8(b)(4)(ii) violation (quoting *NLRB v. Int'l Bhd. of Elec. Workers, Local Union No. 769*, 405 F.2d 159, 162 (9th Cir. 1968))). The Court has cautioned that the words "threaten, coerce, or restrain" are "'nonspecific, indeed vague,' and should be interpreted with 'caution' and not given a 'broad sweep.'" *DeBartolo*, 485 U.S. at 578 (quoting *NLRB v. Drivers, Local Union No. 639*, 362 U.S. 274, 290 (1960)); *cf. Overstreet*, 409 F.3d at 1212 ("The only activity that appears to be clearly proscribed by the statute is '*ambulatory* picketing' of secondary businesses." (quoting *DeBartolo*, 485 U.S. at 587)).

The Drivers anticipate that they will be subject to a "coercive campaign" by Local 117. Tellingly, however, they do not provide any facts about the foreseen campaign, much less offer any facts showing that such a campaign would be coercive within meaning of section 8(b)(4). Whether Local 117 will engage in conduct that is "sufficiently 'intimidat[ing],'" *Overstreet*, 409 F.3d at 1213 (alteration in original) (quoting *DeBartolo*, 485 U.S. at 580), is wholly speculative.

Troublingly, Clark and Dunlap admit in the Complaint that they are not even "qualifying drivers" within meaning of the Ordinance. Thus, Clark and Dunlap will not be subject to the Ordinance's provisions regarding disclosure of

qualifying driver information. Nor will they play any role in the EDR certification process. Any injury Clark and Dunlap claim they will suffer is removed even further than the other Drivers' asserted injuries. Clark and Dunlap's claims are therefore unripe for these additional reasons.

Finally, the Drivers cite to authorities that do not support their position. The Drivers cite to *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), for the proposition that the Drivers need not "await the consummation of threatened injury to obtain preventive relief." *Id.* at 298 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). However, the Drivers ignore the language surrounding the quoted sentence, which makes clear that an injury that is "*certainly* impending . . . is enough," *id.* (emphasis added) (quoting *Pennsylvania*, 262 U.S. at 593), and that "[a] plaintiff who challenges a statute must demonstrate a *realistic* danger of sustaining a *direct* injury as a result of the statute's operation or enforcement," *id.* (emphasis added) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). As discussed above, the Drivers' theories of injury do not meet these criteria.

The Drivers' citation to *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), is similarly unavailing, as the plaintiffs in that case faced certain, "imminent harm." *Id.* at 1057–59 (concluding irreparable harm was likely, where plaintiff motor carriers were subject to an immediate "Hobson's choice" of either signing agreements, which would cause them to "incur large costs" and "disrupt and change the whole nature of [their] business[es]," or refusing to sign the agreements, which would entail "a loss of customer goodwill," at minimum, or an entire loss of business). Here, while the Drivers point to the Ordinance's civil penalty provisions for *driver*

*coordinators* who fail to comply with the Ordinance's disclosure and negotiation provisions, *see* Seattle, Wash., Municipal Code § 6.310.735(D), (H)(1), (M)(1)(b), such injuries, even if they materialized, would not be particularized to the Drivers. The Drivers cannot claim for themselves any imminent injuries that Uber and Lyft are poised to incur.

The Drivers' reliance on case law from the context of pre-enforcement challenges is also misplaced. *See, e.g.*, *Haw. Newspaper Agency v. Bronster*, 103 F.3d 742, 746–47 (9th Cir. 1996) (holding that a preemption claim challenging a state law was ripe where plaintiffs intended to violate the law; the state expressed its intent to enforce the law against plaintiffs; and compliance with the law would force plaintiffs to disclose financial records that would otherwise be confidential). Where a plaintiff intends to challenge a statute prior to its enforcement, "generalized threats of prosecution do not confer constitutional ripeness." *Bishop Paiute Tribe*, 863 F.3d at 1154. Rather, there must be "a *genuine* threat of *imminent* prosecution." *Id.* (emphasis added) (citing *Thomas*, 220 F.3d at 1139). To determine whether a genuine threat of imminent prosecution exists, we use three factors: "[W]e look to whether the plaintiffs have articulated a concrete plan to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* (quoting *Thomas*, 220 F.3d at 1139). Suffice to say, these three factors are absent in the present case. The Drivers have not outlined a concrete plan to engage in proscribed conduct; the municipal authorities have not voiced intent to prosecute or otherwise penalize the Drivers; and there has been no history of past prosecution or enforcement under the Ordinance. The Drivers' claims bear

no resemblance to the prototypical pre-enforcement challenge case, in which "the threatened enforcement of a law" against a plaintiff is imminent. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).

Thus, we conclude that the Drivers have not satisfied the constitutional component of ripeness, and their NLRA preemption claims are unripe.[6]

## II. The Drivers' First Amendment Claim Is Unripe.

The Drivers' First Amendment claim is unripe for the same reasons. The Drivers assert that the Ordinance violates their First Amendment rights "because it calls for transferring [the] Drivers' speech rights to an unwanted representative." They predict, "If the Ordinance's organizing process is permitted to proceed, [the] Drivers could be collectivized at any time." These arguments belie the speculative nature of the Drivers' asserted injuries in fact.

The Drivers' actual injuries hinge on a prospective chain of events that have not yet occurred, and may never occur. First, Local 117 must be elected the EDR for Uber or Lyft. Second, Local 117 must then participate in collective bargaining negotiations with Uber or Lyft. However, no

---

[6] Because the Drivers have not met the constitutional component of ripeness, we need not decide whether they have satisfied the prudential component of ripeness. Even accepting for the sake of argument that certain prudential considerations tip favorably to the Drivers, we cannot alchemize prudential factors into Article III standing. Ultimately, "[p]rudential considerations of ripeness are discretionary," *Bishop Paiute Tribe*, 863 F.3d at 1154 (quoting *Thomas*, 220 F.3d at 1142), and mere satisfaction of prudential considerations, without satisfaction of the constitutional component of ripeness, will not cure an unripe claim.

entity—union or otherwise—has achieved EDR certification, much less impinged on the Drivers' freedom of speech by representing them at the negotiating table. Accordingly, at this time, the Drivers' First Amendment claim is unripe.

## CONCLUSION

"If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Because the Drivers' claims are unripe, we lack jurisdiction to consider the merits. For the foregoing reasons, we affirm the district court's dismissal of the Drivers' action.

AFFIRMED.