**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN STOCKTON; RICHARD EGGLESTON, MD; THOMAS T. SILER, MD; DANIEL MOYNIHAN, MD; CHILDREN'S HEALTH DEFENSE, not-for-profit corporation; JOHN AND JANE DOES, MDs 1-50, | No. 24-3777 D.C. No. 2:24-cv-00071-TOR |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| NICK BROWN,[*] Attorney General of the State of Washington; KYLE S. KARINEN, Executive Director of the Washington Medical Commission, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Nick Brown is automatically substituted for his predecessor, Robert Ferguson, as the Attorney General of the State of Washington. We accordingly grant the Appellants' motion to substitute (Dkt. 45).

Argued and Submitted May 14, 2025
San Francisco, California

Filed September 17, 2025

Before: SIDNEY R. THOMAS, MILAN D. SMITH, JR.,
and DANIEL A. BRESS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence by Judge Bress

## SUMMARY[**]

### *Younger* Abstention/Ripeness

The panel affirmed the district court's dismissal of an action against the Attorney General of Washington and the Executive Director of the Washington Medical Commission challenging the Commission's practice of disciplining physicians for spreading COVID-19 "misinformation."

Plaintiffs include physicians who have been charged with unprofessional conduct, physicians who have not been charged, and other advocates. Plaintiffs brought four claims seeking declaratory judgments that: (1) future investigations, prosecutions, and sanctioning of physicians for speaking out about COVID-19 violate the First Amendment; (2) current investigations, prosecutions, and sanctioning of physicians,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

including Drs. Eggleston and Siler, violate the First Amendment; (3) two provisions of Washington's Uniform Disciplinary Act are facially unconstitutional, overbroad and/or vague; and (4) the Commission proceedings violated plaintiffs' due process rights.

The panel held that *Younger* abstention barred Claims 2, 3, and 4 because they raise challenges to ongoing state civil proceedings, the medical disciplinary proceedings at issue qualify as quasi-criminal state enforcement proceedings within the meaning of *Younger*, the proceedings implicate important state interests, and the disciplinary process contains an avenue for judicial review of federal claims. *Younger* abstention also barred Claim 1 as to Dr. Eggleston and Dr. Siler, who are subjects of ongoing state disciplinary proceedings.

The panel held that *Younger* abstention did not foreclose Claim 1 as to Dr. Moynihan, John Stockton, and Children's Health Defense (CHD) because *Younger* is inapplicable to claims seeking prospective relief. Nevertheless, Claim 1 was constitutionally unripe because no injury has yet been suffered. Claim 1 also was prudentially unripe because it involved hypothetical future prosecutions against unnamed and unknown doctors and required further factual development.

Concurring in part and concurring in the judgment, Judge Bress ultimately agreed with the majority that plaintiffs' claims cannot move forward, but he disagreed in some respects with the majority's reasoning and set forth a separate analysis.

**COUNSEL**

Richard Jaffe (argued), Sacramento, California; Todd S. Richardson, Law Offices of Todd S. Richardson PLLC, Clarkson, Washington; Robert F. Kennedy Jr., Hurley, New York; for Plaintiffs-Appellants.

Andrew R.W. Hughes (argued), Jonathan J. Guss, and Sarah E. Smith-Levy, Assistant Attorneys General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Seattle, Washington; for Defendants-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

After the outbreak of the COVID-19 pandemic, the Washington Medical Commission investigated and brought professional disciplinary charges against physicians who had spread COVID-19 "misinformation." This included physicians who authored editorials on controversial issues related to COVID-19, including the efficacy of vaccines and alternative treatments. The plaintiffs in this case—physicians who have been charged with unprofessional conduct, physicians who have not been charged, and other advocates (collectively, the Plaintiffs)—brought free-speech and due-process challenges against this practice and raised related facial challenges to Washington law. The district court dismissed all the Plaintiffs' claims.

We affirm. We appreciate that the Plaintiffs vigorously disagree with the Washington Medical Commission's

practices and actions. For several reasons, though, we cannot reach the merits of the Plaintiffs' constitutional challenges. The district court properly dismissed all the Plaintiffs' claims.

## BACKGROUND

### I. Factual Background

In July 2021, the Board of Directors of the Federation of State Medical Boards—a non-profit organization purporting to represent state medical boards throughout the United States—issued a statement in response to what it perceived as "a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media[.]" According to the statement, "[p]hysicians who generate and spread COVID-19 vaccine misinformation or disinformation" were "risking disciplinary action by state medical boards" because spreading inaccurate information about the COVID-19 vaccine contradicts physicians' responsibilities to practice medicine in the best interest of their patients and to rely on scientifically grounded public health information. The statement also expressed concern that spreading inaccurate information about COVID-19 vaccines "threatens to further erode public trust in the medical profession and puts all patients at risk."

Afterwards, the Washington Medical Commission (the Commission) voted to adopt a similar guidance policy suggesting that the Commission would discipline physicians licensed in Washington who spread COVID-19 misinformation. The policy stated that the Commission supported the Federation of State Medical Boards's misinformation position—and that it would apply those

principles more broadly, extending beyond vaccines to "all misinformation regarding COVID-19 treatments and preventive measures such as masking." The Commission emphasized that COVID-19 prevention and treatment should be treated like any other disease response and, as such, "[t]reatments and recommendations regarding [COVID-19] that fall below [the] standard of care as established by medical experts, federal authorities and legitimate medical research are potentially subject to disciplinary action," and it encouraged the public and physicians to file complaints if they knew of instances in which the standard of care had been breached. The Commission stated that, in determining the standard of care, it relied on the FDA's approved list of medications to treat COVID-19, which did not include ivermectin or hydroxychloroquine.

According to the Plaintiffs, since the issuance of that policy, the Commission has investigated, prosecuted, and/or sanctioned as many as sixty physicians for communications related to COVID-19 under Washington's Uniform Disciplinary Act. *See* Wash. Rev. Code § 18.130.180.

One such physician is Dr. Richard Eggleston, a retired ophthalmologist and one of the Plaintiffs in this case. Since January 2021, Dr. Eggleston has been an opinion writer for the *Lewiston Tribune,* a newspaper in the Pacific Northwest. Dr. Eggleston often writes from what he deems to be a "conservative-oriented" perspective about high-profile issues—especially topics related to the COVID-19 pandemic. For example, Dr. Eggleston published an editorial entitled "When it comes to COVID-19, dare to be a free thinker" expounding on his views of the dangers of the COVID-19 vaccine and his belief that ivermectin would

soon be the standard of care for preventing and treating COVID-19.

In late 2021, the Commission began an investigation into Dr. Eggleston based on his articles. The Commission eventually charged him with professional misconduct based on his writings, contending that he had committed unprofessional conduct within the meaning of the Washington Uniform Disciplinary Act, namely an act of "moral turpitude, dishonesty, or corruption relating to the practice of [his] profession," as well as "[m]isrepresentation or fraud in any aspect of the conduct of the . . . profession." *See* Wash. Rev. Code § 18.130.180(1), (13). The prosecution of Dr. Eggleston remains ongoing. Dr. Eggleston contends that the investigation and prosecution has chilled his willingness to speak out about COVID-19 issues, in part because it motivated him to only write rebuttals to other editorials about COVID-19 rather than authoring his own opinions.

The Commission also took action against another plaintiff, Dr. Thomas T. Siler. Dr. Siler is a retired physician who wrote a series of posts for AmericanThinker.com about COVID-19, the safety and efficacy of the mRNA vaccine for the disease, and the CDC's recommendations. Based on these posts, he was investigated and charged with professional misconduct in the same manner as Dr. Eggleston. According to a declaration, after the investigation began, Dr. Siler wrote only one more article because he was not sure what the outcome of the investigation would be.[1]

---

1 In our recitation of the facts and our analysis, we rely on information contained in articles and declarations attached to the parties'

A third physician, Dr. Daniel Moynihan, is also one of the Plaintiffs here. Dr. Moynihan is a retired family medicine physician who volunteers for Children's Health Defense (CHD). Although he has not been prosecuted by the Commission, Dr. Moynihan states that his willingness to publicly speak out about COVID-19 issues has been chilled by the Commission's investigations and prosecutions. A Commission representative explained that it had received a complaint that Dr. Moynihan had been disseminating misinformation about COVID-19 vaccines but that it had investigated the complaint and closed it without taking action.

This case also involves three plaintiffs who are not physicians: (1) CHD, a non-profit corporation whose mission is to advocate for child medical welfare and medical freedom; (2) John Stockton, a former NBA player for the Utah Jazz, who considers himself "a vocal advocate against the mainstream Covid narrative" and hosts a podcast that deals with issues such as the COVID-19 pandemic and medical freedom; and (3) John and Jane Does (the Doe Doctors), unknown doctors who are the subject of Commission investigations and prosecutions for speaking out on COVID-19 issues.

---

preliminary-injunction filings. Although we ordinarily refrain from looking at evidence extrinsic to the complaint when ruling on a motion to dismiss, we may do so when ruling on a jurisdictional challenge, as here. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003). Additionally, *both* parties rely on material outside their complaint; indeed, the Defendants suggest that this material has been incorporated into the pleadings.

## II. Procedural History

The Plaintiffs filed the operative First Amended Complaint on April 9, 2024. The First Amended Complaint named as Defendants the Attorney General of Washington and the Executive Director of the Commission, in their official capacities.

The First Amended Complaint challenged the Commission's investigation and prosecution of Dr. Eggleston and Dr. Siler, as well as the Commission's overall practice of disciplining physicians for COVID-19 misinformation. The Plaintiffs requested (1) a declaratory judgment that future investigations, prosecutions, and sanctioning of physicians for speaking out about COVID-19 violates the First Amendment (Claim I); (2) a declaratory judgment that current investigations, prosecutions, and sanctioning of physicians, including Dr. Eggleston and Dr. Siler, for speaking out about COVID-19 violates the First Amendment (Claim II); (3) a declaratory judgment that two provisions of the Washington Uniform Disciplinary Act, Wash. Rev. Code § 18.130.180(1) and (13), are facially unconstitutional, overbroad, and/or vague (Claim III); and (4) a declaratory judgment that the Commission proceedings violated the Plaintiffs' due process rights (Claim IV). The Plaintiffs sought injunctive relief on all four claims.

The district court dismissed the First Amended Complaint on the Defendant's motion. The district court granted the motion to dismiss because (1) the Plaintiffs' claims were constitutionally unripe; (2) the Plaintiffs' claims were prudentially unripe; and (3) the district court was required under *Younger v. Harris*, 401 U.S. 37 (1971), to abstain from exercising jurisdiction because the Plaintiffs' claims challenged ongoing state disciplinary proceedings.

The district court further ruled, on the merits, that (1) the Plaintiffs failed to state an as-applied First Amendment claim; (2) even if the Plaintiffs' claim was plausible, the State could regulate the physicians' professional misconduct without regulating speech; and (3) the Plaintiffs' due process challenges failed.[2]

The Plaintiffs timely appeal. *See* Fed. R. App. P. 4(a)(1)(A).

## JURISDICTION AND STANDARD OF REVIEW

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review abstention, standing, and ripeness issues de novo. *See 50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*, 129 F.4th 1186, 1187 (9th Cir. 2025) (ripeness and standing); *Betschart v. Oregon*, 103 F.4th 607, 616 (9th Cir. 2024) (abstention).

## ANALYSIS

The district court dismissed the Plaintiffs' claims on abstention and ripeness grounds, as well as on the merits. We begin—and end—our analysis on the first two grounds. Because we conclude that all of the Plaintiffs' claims are barred based on the doctrines of abstention and ripeness, we lack jurisdiction to address the merits of the Plaintiffs' constitutional challenges. In the course of our de novo review, we will address abstention and ripeness on a claim-by-claim basis. *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("'[S]tanding is not dispensed in gross.' That is, 'plaintiffs must demonstrate standing for each claim that

---

2 The district court also concluded that the Plaintiffs were not entitled to amend their pleadings for a second time. The Plaintiffs raise no challenge to this aspect of the district court's ruling, so we will not discuss it further.

they press' against each defendant, 'and for each form of relief that they seek.'" (citation omitted) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))); *Pizzuto v. Tewalt*, 997 F.3d 893, 903 (9th Cir. 2021) (applying "principles of ripeness . . . to each of the plaintiffs' specific claims"); *Herrera v. City of Palmdale*, 918 F.3d 1037, 1048–49 (9th Cir. 2019) (considering *Younger* abstention on a claim-by-claim basis).

## I. Abstention

We begin with abstention.[3] The district court concluded that the doctrine of *Younger* abstention required it to abstain from considering any of the Plaintiffs' claims. We agree in part—Claims II, III, and IV are indeed barred. So is Claim I as asserted by Dr. Eggleston and Dr. Siler. But abstention is inapplicable as to Claim I as asserted by Dr. Moynihan, Stockton, and CHD.

### A. Principles of *Younger* Abstention

"Federal courts have a presumptive, or what is sometimes said to be 'virtually unflagging,' obligation to decide cases within their jurisdiction." *Yelp Inc. v. Paxton*, 137 F.4th 944, 950 (9th Cir. 2025) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)). "*Younger* abstention is an exception to that rule, reflecting a

---

3 The parties and the district court discussed ripeness before reaching *Younger* abstention. However, we have discretion to begin with the *Younger* abstention issue. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("Nor must a federal court decide whether the parties present an Article III case or controversy before abstaining under *Younger*[.]"); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("[C]ourts do not overstep Article III limits when they . . . abstain under *Younger* . . . without deciding whether the parties present a case or controversy." (citations omitted)).

'national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances.'" *Id.* (quoting *Younger*, 401 U.S. at 41). "This doctrine is based on 'a strong federal policy against federal-court interference with pending state judicial proceedings,' and on the recognition that '[c]ourts have long had discretion not to exercise equity jurisdiction when alternatives are available.'" *Id.* (alteration in original) (first quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982); then quoting *Gilbertson v. Albright*, 381 F.3d 965, 970 (9th Cir. 2004) (en banc)). The doctrine is "[r]ooted in overlapping principles of equity, comity, and federalism." *Roshan v. McCauley*, 130 F.4th 780, 782 (9th Cir. 2025) (quoting *Arevalo v. Hennessy*, 882 F.3d 763, 765 (9th Cir. 2018)).

Although *Younger* itself involved criminal proceedings, the abstention doctrine has since "been extended to prevent federal court injunctions of certain ongoing state civil proceedings." *Yelp*, 137 F.4th at 950; *see also Bristol-Myers Squibb Co. v. Connors*, 979 F.3d 732, 735 (9th Cir. 2020) (observing that a "concern for comity and federalism" led the Supreme Court to "expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings" (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 367–68 (1989))). "For civil cases, '*Younger* abstention is appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges.'" *Yelp*, 137 F.4th at 950 (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)). "If these

requirements are met, 'we then consider whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to *Younger* applies.'" *Id.* (quoting *ReadyLink Healthcare*, 754 F.3d at 759).

## B. Application

Reviewing the issues de novo, we conclude that abstention under *Younger* is required for Claims II, III, and IV, which relate to *ongoing* investigations and prosecutions of physicians. But, at least with respect to some of the Plaintiffs, abstention is inappropriate as to Claim I, which seeks to enjoin *future* investigations and prosecutions.[4]

### 1. Claims II, III, and IV

We turn first to whether *Younger* abstention was proper with respect to the claims that challenge the ongoing investigation and prosecution of Dr. Eggleston, Dr. Siler, and the Doe Doctors (Claims II, III, and IV). *See supra* n.4. For the reasons given below, abstention is proper, so we cannot reach the merits of these claims.

---

4 In dividing Claim I from Claims II, III, and IV for purposes of the *Younger* analysis, we follow the Plaintiffs' own framing. The Plaintiffs cast Claim I as focusing on future investigations and thus falling outside the ambit of *Younger* abstention. However, they do not raise that argument as to Claims II, III, and IV, instead relying on other arguments as to why *Younger* abstention does not apply to those claims. That delineation makes sense in light of the First Amended Complaint. Claim II clearly relates to "current" ongoing investigations. And although it is less clear from the face of the First Amended Complaint whether Claims III and IV seek relief from current enforcement proceedings or are wholly prospective, we will follow the Plaintiffs' framing and treat only Claim I as prospective.

### a.  Elements for *Younger* Abstention

As indicated above, *Younger* abstention is appropriate in cases involving state civil proceedings if (1) the state civil proceedings are ongoing; (2) the state civil proceedings are, *inter alia*, quasi-criminal enforcement actions; (3) the proceedings implicate an important state interest; and (4) the litigants have an opportunity to raise federal challenges to the state proceedings.  *See Yelp*, 137 F.4th at 950.  All of these elements are present here.

*First*, this case clearly involves ongoing state civil proceedings—the disciplinary proceedings against Dr. Siler, Dr. Eggleston, and the Doe Doctors.  The Plaintiffs concede as much, describing the proceedings as "ongoing" and insisting that Dr. Eggleston and Dr. Siler are "actively defending against" disciplinary charges.  Likewise, the First Amended Complaint expressly challenges "current" investigations and prosecutions.

*Second*, the medical disciplinary proceedings at issue qualify as quasi-criminal state enforcement proceedings within the meaning of *Younger*.  *See Middlesex Cnty. Ethics Comm.*, 457 U.S. at 433–35 (concluding that *Younger* abstention was appropriate in bar disciplinary proceedings); *Roshan*, 130 F.4th at 783 (concluding that a disciplinary procedure that could result in revocation of a real estate license was a quasi-criminal proceeding); *Alsager v. Bd. of Osteopathic Med. & Surgery*, 573 F. App'x 619, 620 (9th Cir. 2014) (abstaining under *Younger* from hearing a challenge to disciplinary proceedings conducted by Washington's Board of Osteopathic Medicine and

Surgery); [5] *accord Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163–65 (10th Cir. 1999) (abstaining under *Younger* from reviewing administrative proceedings conducted by the Colorado Board of Medical Examiners). The Plaintiffs raise no argument to the contrary.

*Third*, the proceedings also implicate important state interests—namely, the State of Washington's interest in regulating the practice of medicine to ensure that patients receive quality health care. *See Buckwalter v. Nev. Bd. of Med. Exam'rs*, 678 F.3d 737, 747 (9th Cir. 2012) ("It is self-evident that the Board's disciplinary proceedings implicate the important state interest of ensuring quality health care."); *see also Alsager*, 573 F. App'x at 620; *accord Amanatullah*, 187 F.3d at 1164–65 ("[T]here is no question that the licensing and discipline of physicians involves important state interests . . . .").

The Plaintiffs suggest that the State lacks a legitimate (let alone an important) interest in regulating speech. But the Plaintiffs did not argue to the district court that this element was not met, so they have forfeited any challenge on this point. *See Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025). In any event, the Plaintiffs' argument is unavailing; such a cribbed view of the interest at issue would necessarily foreclose *Younger* abstention in all cases involving an alleged deprivation of free-speech rights. Additionally, "[t]he importance of the interest is measured by considering its significance broadly, rather than by focusing on the state's interest in the resolution of an individual case." *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 618 (9th Cir.

---

5 Although it is not binding, the panel's decision in *Alsager* is persuasive and well-reasoned, so we rely on it here.

2003). Thus, the inquiry is not whether the state has an interest in these specific disciplinary decisions but whether it has a legitimate interest in medical disciplinary proceedings generally. *See id.*; *see also Bristol-Myers Squibb*, 979 F.3d at 738 (looking to "the general class of cases of which this state proceeding is a member" to determine whether there is a legitimate interest). It clearly does.

*Fourth*, the disciplinary process contains an avenue for judicial review of federal claims—that is, physicians who are disciplined by the Commission have a right to appeal to state court and may raise claims that the Commission's disciplinary order "is in violation of constitutional provisions on its face or as applied[.]" Wash. Rev. Code § 34.05.570(3)(a). As a panel of our Court explained in *Alsager*, this process affords litigants an "adequate opportunity to raise [their] constitutional claims."**[6]** 573 F. App'x at 620–21; *see also Buckwalter*, 678 F.3d at 748 ("Should he lose in the disciplinary hearing, Buckwalter will

---

[6] In their reply brief, Plaintiffs argue that the fourth element is not met because they cannot raise constitutional challenges before the Commission and must wait until an appeal is taken to state court. This argument is doubly forfeited, as it was not raised in the Plaintiffs' district court briefing or in their opening brief. *See Lui*, 129 F.4th at 780. Regardless, this argument fails under binding precedent. *See Buckwalter*, 678 F.3d at 747 ("The . . . factor is satisfied by the fact that Nevada courts may entertain federal questions when they review the Board's judgments."); *Kenneally v. Lungren*, 967 F.2d 329, 332 (9th Cir. 1992) ("'[E]ven if a federal plaintiff cannot raise his constitutional claims in state administrative proceedings that implicate important state interests, his ability to raise the claims via state judicial review of the administrative proceedings suffices.'" (quoting *Partington v. Gedan*, 880 F.2d 116, 124 (9th Cir. 1989), *rev'd on other grounds*, 497 U.S. 1020 (1990) (mem.))).

have an adequate opportunity to raise his federal constitutional challenges on appeal to the Nevada courts.").

With the four threshold elements of *Younger* satisfied for Claims II, III, and IV, the inquiry becomes "whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to *Younger* applies."  *Yelp*, 137 F.4th at 951 (quoting *ReadyLink Healthcare*, 754 F.3d at 759).  The first of these questions is easily resolved because the Plaintiffs *expressly* requested "permanent injunctive relief barring the Defendants from continuing all current investigations and prosecutions[] of physicians" that are allegedly based on protected speech. We thus turn to the exceptions to *Younger* abstention.

### b.  Exceptions to *Younger* abstention

"*Younger* indicated that abstention would not be warranted upon a 'showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief.'"  *Yelp*, 137 F.4th at 951 (quoting *Younger*, 401 U.S. at 54); *see also Arevalo*, 882 F.3d at 765–66 ("[E]ven if *Younger* abstention is appropriate, federal courts do not invoke it if there is a 'showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate.'" (quoting *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 435)).

The Plaintiffs argue that this case falls within these exceptions for several reasons.  They first argue that the state enforcement proceedings were brought in bad faith because they were intended to deter unpopular speech in violation of the First Amendment.  This argument is insufficient for avoiding *Younger*.

"'[I]n the *Younger* abstention context, bad faith "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction."'" *Yelp*, 137 F.4th at 951 (quoting *Baffert*, 332 F.3d at 621). Such bad faith might be shown by repeated harassment, bias, or when the proceeding is brought with no legitimate purpose. *See id.* at 951–52; *see also Bristol-Myers Squibb*, 979 F.3d at 738; *Krahm v. Graham*, 461 F.2d 703, 707 (9th Cir. 1972). But a mere allegation of bad faith or unconstitutionality is not a get-out-of-abstention-free card. *See Yelp*, 137 F.4th at 952–53. Otherwise, "every state court defendant could become a federal court plaintiff seeking an injunction of the state proceedings in which its defenses could properly be interposed." *Id.* at 952. Under this standard, we are unconvinced that this is one of the rare cases where the proceedings were "brought without a reasonable expectation of obtaining a valid judgment" against the physicians. *Id.*

The Plaintiffs point to cases indicating that the bad faith exception can apply "when a state commences a prosecution or proceeding to retaliate for" constitutionally protected conduct. *See, e.g.*, *Bishop v. State Bar of Tex.*, 736 F.2d 292, 294 (5th Cir. 1984). According to the Plaintiffs, because the disciplinary proceedings were brought in retaliation for protected speech—and to deter unpopular speech—*Younger* abstention does not apply. But this rule does not help the Plaintiffs escape abstention.

As with an allegation of bad faith, an allegation of a retaliatory motive is not a "talisman sufficient to overcome an otherwise proper exercise of abstention." *Yelp*, 137 F.4th at 953 (quoting *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 597 (9th Cir. 2022)). Because *Younger* abstention is based on concerns of federalism and comity, we intervene in

pending state proceedings only when the "retaliatory motive or harassment [is] sufficiently severe or pervasive to legitimize our halt of state court proceedings in which these same constitutional objections could be raised." *Id.* at 954.

Although the Plaintiffs insist that this is one of those cases given the volume of purportedly unconstitutional charges brought against physicians, we are unpersuaded. Even leaving aside the fact that the record lacks details about any proceedings except for those against Dr. Eggleston and Dr. Siler, the Plaintiffs have failed to show why their free-speech rights could not be adequately protected by the state courts. This is a far cry from the extreme circumstances in which courts have applied this aspect of the bad faith exception, which have involved charges clearly filed for harassment or some other improper purpose. *Cf. Krahm*, 461 F.2d at 707 (concluding that abstention was inappropriate in a case involving over a hundred prosecutions and where successful defense against some prosecutions just led to the filing of additional charges); *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994) (concluding that abstention was inappropriate where the proceedings were instituted due to personal conflicts and animus).[7] These cases set forth a strikingly "narrow" exception to *Younger*. *See Yelp*, 137 F.4th at 953–56.

---

[7] That was also the case in *Dombrowski v. Pfister*, a pre-*Younger* case relied on heavily by the Plaintiffs. *See* 380 U.S. 479, 483–86 (1965) (concluding that irreparable injury was shown when statutes were threatened to be enforced in a racially discriminatory manner and to harass Black citizens). The Plaintiffs also fail to reckon with the fact that the general principles set forth in *Dombrowski* were limited by *Younger* itself. *See Younger*, 401 U.S. at 50–53 (making clear that a chilling effect on speech alone is not sufficient to justify federal interference in state proceedings).

This is not one of the cases that fall within that narrow exception, notwithstanding the First Amendment interests at play. *See id.* at 955 (concluding that a plaintiff had not shown harassment or retaliation when it failed to show bias by the tribunal, a serial pattern of litigation against the plaintiff, or a history of personal conflict or animus). By the allegations of the operative complaint, there was no concerted bad-faith campaign against any of the physicians; to the contrary, there is only a bald assertion that the Commission is infringing the First Amendment rights of the physicians by disciplining them.

The Plaintiffs further insist that the bad-faith exception applies because this case involves "censorship" in violation of the First Amendment. This argument fails: notwithstanding the importance of free speech rights in our democratic society, there is no free-speech exception to *Younger* abstention. *See Yelp*, 137 F.4th at 953; *Bristol-Myers Squibb*, 979 F.3d at 738 (rejecting the argument that because "First Amendment interests are at stake," greater scrutiny of *Younger* abstention was warranted because "*Younger* abstention routinely applies even when important rights are at stake"); *accord Younger*, 401 U.S. at 50 (rejecting the argument that a chilling effect on speech can, alone, be sufficient to justify federal intervention into a state proceeding). As we reasoned in *Yelp*, "[m]any cases applying *Younger*—and *Younger* itself—abstained from enjoining state court proceedings in the face of arguments that applying a state statute would be unconstitutional, including under the First Amendment." 137 F.4th at 953. In short, free-speech rights are treated like other constitutional rights in the *Younger* analysis—in the interest of comity, we generally rely on state courts to vindicate those rights in state proceedings.

Finally, "[f]ederal courts will not abstain under *Younger* in 'extraordinary circumstances where irreparable injury can be shown.'" *Page v. King*, 932 F.3d 898, 902 (9th Cir. 2019) (quoting *Brown v. Ahern*, 676 F.3d 899, 903 (9th Cir. 2012)). Mirroring their argument on bad faith, the Plaintiffs insist that this exception applies because of the importance of the free-speech rights involved and the scope of the Commission's purportedly unlawful activities.

We are unpersuaded. The fact that a case involves "First Amendment concerns" is not enough to "bring [that] case within the scope of the [extraordinary-circumstances] exception." *Bristol-Myers Squibb*, 979 F.3d at 738. This is not a situation where the Plaintiffs' rights cannot be vindicated in due course in state court. *Cf. Bean v. Matteucci*, 986 F.3d 1128, 1134–35 (9th Cir. 2021) (concluding that the extraordinary-circumstances exception applied because a plaintiff could not later vindicate his right to be free from forcible medication). Thus, the exception is inapplicable.

### 2. Claim I

We agree with the district court's decision that *Younger* abstention forecloses consideration of Claim I for Dr. Eggleston and Dr. Siler but disagree with that conclusion as to the remaining Plaintiffs.

Dr. Eggleston and Dr. Siler are the subjects of ongoing state disciplinary proceedings. Yet through Claim I they would purport to obtain a court order declaring future proceedings of the same kind unlawful under the First Amendment. Such a shortcut around *Younger* is not permissible. It takes little imagination to see that such an order would have the practical effect of enjoining Dr.

Eggleston's and Dr. Siler's own ongoing state proceedings. *See Yelp*, 137 F.4th at 951.

As a leading treatise explains, if a *Younger*-qualifying state proceeding is pending, "the defendant in that action cannot escape the bar of *Younger* by suing in federal court only to enjoin future state prosecutions, since there would be a risk that a federal court judgment would influence the pending state court prosecution." 17B WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 4252 (3d ed. 2025); *see also, e.g.*, *Ballard v. Wilson*, 856 F.2d 1568, 1570 (5th Cir. 1988) ("Although Ballard confines his request to future prosecutions, we cannot ignore the fact that any injunction or declaratory judgment issued by a federal court would affect the course and outcome of the pending state proceedings. . . . This is precisely the sort of interference condemned by the Supreme Court in *Younger* . . . ."); *Suggs v. Brannon*, 804 F.2d 274, 279 (4th Cir. 1986) (concluding that the district court "did not err by denying injunctive relief against future searches and seizures" because such an injunction "would intrude upon the pending state prosecutions where the appellants can question the constitutionality of the searches and seizures"); *United Books, Inc. v. Conte*, 739 F.2d 30, 33 (1st Cir. 1984) (affirming the district court's decision to decline an injunction enjoining future prosecutions because such an injunction would interfere with an ongoing prosecution of the plaintiff).

*Younger* abstention does not foreclose Claim I as to Dr. Moynihan, Stockton, and CHD, however. As the Plaintiffs accurately observe, *Younger* abstention generally applies only when a party seeks to interfere with "ongoing" state proceedings—not future proceedings. In other words, when a party who is not otherwise the subject of ongoing state

proceedings seeks "wholly prospective" relief, *Younger* abstention is inapplicable. *Wooley v. Maynard*, 430 U.S. 705, 711 (1977). That is precisely the case here. In Claim I, the Plaintiffs requested declaratory and injunctive relief prohibiting "future investigations, prosecutions, and sanctioning of physicians" based on their COVID-19-related speech. Thus, at least for some of the Plaintiffs—namely, Dr. Moynihan, Stockton, and CHD, who are not the subject of ongoing disciplinary proceedings—*Younger* abstention poses no bar to our consideration of Claim I. *See id.*; *see also Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 63–65 (9th Cir. 2024) (concluding that *Younger* abstention was inapplicable when the state attorney general had not yet initiated enforcement actions).

In short, Claims II, III, and IV, as asserted by all of the Plaintiffs, are barred by *Younger* abstention because, as the Plaintiffs have framed them, they challenge ongoing state proceedings.[8] So is Claim I as asserted by Dr. Eggleston and

---

8 The concurring opinion concludes that Claims III and IV as asserted by Dr. Moynihan are not barred by *Younger* abstention. Under the unique circumstances of this case, we disagree for two reasons. *First*, the Plaintiffs themselves expressly frame Claims III and IV as challenging "current enforcement activities," *see supra* n.4, rather than the more abstract legal challenge present in the case which the concurring opinion cites, *Green v. City of Tucson*, 255 F.3d 1086, 1099–1100 (9th Cir. 2001). These claims thus run headlong into *Younger* abstention. *Second*, the concurring opinion is certainly correct that "when the federal plaintiff is not a party to the state court action, a mere commonality of interest with a party to the state litigation is not sufficient to justify abstention." *Id.* at 1100. But *Younger* will "oust a district court of jurisdiction over a case where the plaintiff is not a party to an ongoing state proceeding" when the plaintiff's "interest is so intertwined with those of the state court party that direct interference with the state court proceeding is inevitable[.]" *Id.* By framing Dr. Moynihan's Claims III and IV as challenges to ongoing proceedings against Dr. Siler, the

Dr. Siler.  We accordingly conclude that the district court properly dismissed these claims.  It will be up to the state courts to address the constitutional questions raised in those claims.  But *Younger* abstention is inapplicable to Claim I as asserted by the remaining Plaintiffs.

## II.  Ripeness

"'The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ."'"  *Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025) (en banc) (quoting *Nat'l Parks Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)) (omission in original).  "The ripeness doctrine 'is peculiarly a question of timing,' designed 'to separate matters that are premature for review because the injury is speculative and may never occur from those cases that are appropriate for federal court action.'"  *Wolfson v. Brammer*, 616 F.3d 1045, 1057 (9th Cir. 2010) (first quoting *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974); then quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)).  "There are two ripeness considerations:  constitutional and prudential."  *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024).

## A.  Constitutional Ripeness

---

Plaintiffs have entangled Dr. Moynihan's Claims III and IV with those of Dr. Eggleston and Dr. Siler.  We could not reach Dr. Moynihan's challenge to those enforcement activities without directly interfering with the ongoing disciplinary proceedings of Dr. Eggleston and Dr. Siler.  Indeed, Plaintiffs make no effort to argue that Dr. Moynihan's Claim III and Claim IV are different from those of the other Plaintiffs for purposes of *Younger*.  Seen through that lens, we see Claims III and IV as barred by *Younger* abstention across the board.

For a claim to be justiciable, it must be constitutionally ripe. *See Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022), *as amended* (Dec. 14, 2022). "[T]he constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry." *Id.* (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003)). "Whether framed as an issue of standing or ripeness, an injury must involve 'an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (alteration omitted); *see also Stavrianoudakis*, 108 F.4th at 1139 ("Constitutional ripeness overlaps with the injury-in-fact element of Article III standing, and 'therefore the inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical or abstract.'" (quoting *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021))). "But '[w]hile standing is primarily concerned with *who* is a proper party to litigate a particular matter, ripeness addresses *when* that litigation may occur.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 839 (9th Cir. 2024) (quoting *Lee v. Oregon*, 107 F.3d 1382, 1387 (9th Cir. 1997)) (alteration in original).

The district court concluded that the Plaintiffs' claims were constitutionally unripe because they failed to allege a cognizable injury to any Plaintiff with concreteness and particularity. That included the claims of Dr. Moynihan, Stockton, and CHD, as the district court found the injuries to those Plaintiffs to be based solely on "speculation and conjecture."

As with *Younger* abstention, we will undertake the claim-by-claim analysis that the district court did not. In

doing so, we are guided by the Plaintiffs' own framing of the ripeness issue.[9]

We begin with Claims II, III, and IV. The Plaintiffs argue at length that Dr. Eggleston and Dr. Siler have suffered the requisite injury-in-fact to make Claims II, III, and IV ripe. They also argue that Dr. Moynihan has suffered the requisite injury-in-fact for purposes of Claims II and III. But we need not reach these arguments in light of our conclusion that *Younger* abstention bars our consideration of Claims II, III, and IV as asserted by all Plaintiffs. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007); *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008). In light of our conclusion regarding *Younger* abstention, we also do not reach the question of whether Claim I, as asserted by Dr. Eggleston and Dr. Siler, is constitutionally ripe.

We are thus left with the question of whether Claim I as asserted by the remaining Plaintiffs is constitutionally ripe. At oral argument, the Plaintiffs asserted that they had suffered the requisite injury-in-fact for Claim I because (1) Dr. Moynihan's speech had been chilled due to his fear of disciplinary proceedings being brought against him and (2) the Plaintiffs suffered an injury to their right to listen to views about COVID-19 that fall outside the "mainstream" narrative. As explained below, the Plaintiffs have waived the former argument, and the latter argument is unavailing.

---

9 The Plaintiffs cast the constitutional-ripeness inquiry as one of standing. In this context, the constitutional ripeness and standing inquiries are "substantively similar," and we will treat the Plaintiffs' standing arguments as bearing on the constitutional ripeness issue. *See Twitter*, 56 F.4th at 1173–74.

### 1.  Purported Chilling of Dr. Moynihan's Speech

At oral argument, the Plaintiffs suggested that the concrete injury for purposes of Claim I could be based on a chilling of Dr. Moynihan's speech—that is, that Dr. Moynihan feared to express his opinions about COVID-19 out of fear of being investigated and disciplined by the Commission, so he has suffered the necessary injury to bring a general challenge to future investigations and prosecutions. However, we deem this argument waived.

"We review only issues which are argued specifically and distinctly in a party's opening brief.  We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (quoting *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)). Likewise, arguments that are raised for the first time at oral argument are deemed waived, and we will not reach them. *See McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009); *Wood v. Hall*, 130 F.3d 373, 377 (9th Cir. 1997).

In their appellate briefing, the Plaintiffs argue only that the alleged chilling of Dr. Moynihan's speech qualified as the requisite injury-in-fact for purposes of challenging ongoing, as opposed to future, proceedings through Claims II and III—claims that are, as explained above, barred by the doctrine of *Younger* abstention.  In contrast, when arguing that they had suffered a cognizable injury-in-fact for purposes of Claim I, the Plaintiffs argue only that they had suffered an injury to their right to hear and receive information.  Thus, there is no argument in the appellate briefing that the concrete injury for purposes of Claim I could be based on a chilling impact to Dr. Moynihan.

Moreover, even where the Plaintiffs mention the alleged chilling of Dr. Moynihan's speech in their briefing with respect to Claims II, III, and IV, their arguments do not persuade.

We "appl[y] the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Twitter*, 56 F.4th at 1173–74 (quoting *Wolfson*, 616 F.3d at 1058). "This does not mean, however, that any plaintiff may bring a First Amendment claim 'by nakedly asserting that his or her speech was chilled . . . .'" *Id.* (omission in original) (quoting *Getman*, 328 F.3d at 1095). Our pre-enforcement standing inquiry "focuses on (1) whether the plaintiffs have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Twitter*, 56 F.4th at 1174 (quoting *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007)); *see also Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).

The Plaintiffs' briefing barely mentions this rubric and does not even attempt to explain how the purported chilling injury to Dr. Moynihan satisfies it. They raise only the "bare assertion," *Brownfield*, 612 F.3d at 1149 n.4, that "Moynihan's speaking out against the mainstream COVID narrative appears to be prohibited by Appellees' program" and that "[t]his satisfies pre-enforcement standing." Such barebones briefing, which requires the court to perform all of the analytical heavy lifting and fill in the blanks left empty by the appellant, comes dangerously close to waiving the issue.

In any event, the Plaintiffs have failed to bear their burden to show the requisite injury-in-fact to confer subject-matter jurisdiction. *See Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1151 (9th Cir. 2017). Notwithstanding the relaxed standing principles in the context of the First Amendment, "'[t]he potential plaintiff must have an 'actual or well-founded fear that the law will be enforced against' it." *Twitter*, 56 F.4th at 1174 (quoting *Feldman*, 504 F.3d at 851). The potential plaintiff must thus "giv[e] details about their future speech such as 'when, to whom, where, or under what circumstances'" they intend to violate the law in question. *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010), *as amended* (Dec. 16, 2010) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).[10]

The First Amended Complaint contains no details about Dr. Moynihan's speech except for it falling outside the

---

10 This showing is relaxed if the plaintiff can show that he previously violated the law in question. *See Tingley*, 47 F.4th at 1068 ("[W]e de not require plaintiffs to specify 'when, to whom, where, or under what circumstances' they plan to violate the law when they have already violated the law in the past."); *see also Meinecke v. City of Seattle*, 99 F.4th 514, 520 (9th Cir. 2024). Although Dr. Moynihan was previously investigated by the Commission, it is hard to see how he could reap the benefits of this rule. Dr. Moynihan was investigated by the Commission after it received a complaint that he "had given informed consent about the Covid vaccines" to a patient. According to the Commission, it investigated the complaint, which was based on the allegation that Dr. Moynihan "was disseminating misinformation about COVID-19 vaccines," and closed its investigation without taking action. In the absence of more detailed allegations about this past investigation, we are unpersuaded that this is a situation where Dr. Moynihan "already violated the law [at issue] in the past." *Tingley*, 47 F.4th at 1068. Furthermore, the Plaintiffs make no effort to invoke this rule or explain why Dr. Moynihan would fit within it.

"mainstream COVID narrative."  Nor does Dr. Moynihan's declaration set forth enough for us to conclude that a chilling injury is present.   Dr. Moynihan's declaration explains that he "think[s]" that "continued COVID boosters are unnecessary and even potentially dangerous" and that he "believe[s] that . . . Ivermectin and [Hydroxychloroquine] are highly effective."  But there is a dearth of information about what Dr. Moynihan wishes to say on those topics, whom he wants to speak to, and under what circumstances he intends to speak.  The Plaintiffs' briefing is silent on how these statements would be sufficient and whether they would comport with our framework for pre-enforcement standing and ripeness.

Our recent decision in *Flaxman v. Ferguson*, --- F.4th ---- (9th Cir. Aug. 22, 2025), does not require a different result. That case involved a pair of University of Washington professors who moderated a campus listserv.  Slip Op. at 5. The professors alleged that they had previously been retaliated against for their protected speech in moderating the listserv, and they sought to challenge specific speech-restricting policies and practices that allegedly chilled their speech.  Slip Op. at 11–12.  Here, unlike the plaintiffs in *Flaxman*, Dr. Moynihan was not previously disciplined for his speech, and his challenge is comparably much less specific.

"At bottom," the Plaintiffs bear the burden of showing federal subject-matter jurisdiction, "and we are not obliged to take up their mantle" and flesh out perfunctory justiciability arguments that the Plaintiffs failed to develop or make with any specificity. *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1292 (10th Cir. 2024).  That is the situation here.  Plaintiffs' opening brief never argued that Claim I was constitutionally ripe based on

an injury to Dr. Moynihan's right to speak.  And even when it did mention Dr. Moynihan's right to speak (in respect to other claims), it did so in an undeveloped and cursory manner.  Accordingly, we conclude that given the non-specific allegations and the presentation of the issues before us, Claim I cannot be constitutionally ripe based on a chilling impact on Dr. Moynihan's speech.

## 2.  Listener Standing

We turn now to the Plaintiffs' main argument: that, for the purposes of Claim I, there has been an injury to Dr. Moynihan, Stockton, and CHD, who have a right to hear information about COVID-19 from physicians who want to air their dissenting views.  For the reasons below, we reject this argument and conclude that the Plaintiffs have not alleged the required injury-in-fact to make Claim I constitutionally ripe as to these Plaintiffs.

"[T]he Constitution protects the right to receive information and ideas.  This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)).  But although the Supreme Court has recognized a "'First Amendment right to receive information and ideas,' [it has] identified a cognizable injury only where the listener has a concrete, specific connection to the speaker." *Murthy*, 603 U.S. at 75 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).  Thus, the Supreme Court has held that a group of professors had a First Amendment interest in challenging the visa denial of an individual they had invited to speak and debate at a conference.  *See Mandel*, 408 U.S. at 762–75.  And it concluded that prescription-drug consumers could challenge

prohibitions on advertising drug prices.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1972).  In contrast, the plaintiffs in *Murthy* had no standing to challenge the censorship of others on social media.  *See* 603 U.S. at 75.  They had no freestanding interest in hearing such information and they had failed to show the requisite connection based on the theory that hearing unfettered speech was crucial to their work and advocacy. *See id.*  The plaintiffs failed to identify specific speakers or topics that they were unable to listen to.  *See id.* at 74–76.

The Plaintiffs assert three different theories on which they have listener standing.  *First*, relying on *Mandel* and *Murthy*, the Plaintiffs assert that Stockton has a sufficient connection with Dr. Eggleston such that Stockton has suffered a concrete injury from Dr. Eggleston's prosecution and investigation.  We disagree.  Even taking into account the additional materials that Stockton has provided in his motion to supplement,[11] the record shows only that Stockton is an avid reader of Dr. Eggleston's work, has hosted Dr. Eggleston on his podcast, and helped to connect Dr. Eggleston with Robert F. Kennedy, Jr. and CHD to bring this case.  Although this evidence shows that Stockton had some connection with Dr. Eggleston, this does not rise to the requisite level for a constitutional injury-in-fact.  *See Murthy*, 603 U.S. at 75.  This is a far cry from *Mandel*. There, the plaintiffs had a First Amendment interest in meeting with, hearing from, and debating a foreign national that they had invited to a conference.  *See* 408 U.S. at 762–65.  Here, in contrast, there is no such connection beyond an avid interest in, and affection for, Dr. Eggleston and his work; there is no suggestion, for example, that Stockton

---

11 Stockton's motion to supplement is granted (Dkt. 22).

wished to have Dr. Eggleston on his podcast again but was prevented from doing so due to the proceedings against Dr. Eggleston. On the continuum from *Murthy* to *Mandel*, Stockton falls far closer to the insufficient showing in *Murthy*. *See* 603 U.S. at 74–76.

The Plaintiffs' theory of injury would seemingly give any listener who has an interest in a speaker's work standing to challenge laws that purportedly restrict the speaker's speech. We refuse to countenance such a "startlingly broad" theory of injury. *See Murthy*, 603 U.S. at 74–75 (rejecting listeners' argument that because of their "interest in reading and engaging with the content of other speakers on social media," they had standing to challenge the alleged censorship of those other speakers).

Furthermore, even if this connection was sufficient to give Stockton an injury from the prosecution and investigation of Dr. Eggleston's speech, it would still not help establish a sufficient injury-in-fact for purposes of Claim I. Unlike Claims II, III, and IV, Claim I focuses on the speech of future, hypothetical doctors. Any purported injury to Stockton from the regulation of those other doctors is, as the district court said, "based on speculation and conjecture."

*Second*, the Plaintiffs, again relying on *Mandel*, assert that CHD has a personal connection with Dr. Moynihan, who allegedly has had his COVID-19 speech chilled by the Commission's actions.[12] But, as explained above, the

---

12 To the extent that CHD intends to assert this claim on behalf of its members—rather than on its own behalf—it has waived that argument. To be sure, "[o]rganizations can assert standing on behalf of their own members or in their own right." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021), *as amended* (March 24, 2021)

Plaintiffs have waived the argument that Dr. Moynihan has suffered a concrete injury from the chilling of his speech for purposes of Claim I.  Even if the theory were not waived, the Plaintiffs have failed to show a concrete injury to Dr. Moynihan's right to speak.  There can thus be no injury to CHD's right to receive information from Dr. Moynihan—after all, CHD's theory depends on there actually being an injury to Dr. Moynihan's right to speak.  *See Murthy*, 603 U.S. at 75 (explaining the limited circumstances in which an individual could sue over "*someone else's* censorship"); *Pennsylvania Fam. Inst., Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007) ("[T]he right to receive speech is 'entirely derivative' of the rights of the speaker." (quoting *In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 608 (2d Cir. 1988)); *see also Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (explaining that there is no listener standing "[i]f there is no willing speaker, *or if no speaker has been subjected to* sanctions" (emphasis added)).

We note also that the Plaintiffs have made little effort to explain how the listener—CHD—"has a concrete, specific connection to the speaker," Dr. Moynihan.  *Murthy*, 603 U.S. at 75.  The Plaintiffs assert, generally, that they "have the right to hear the views of any Washington licensed physician who may choose to speak out against the public health Covid narrative."  All that is alleged about the connection between

(citations omitted).    The former is sometimes called associational standing and carries its own set of requirements. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Fatally, although the Plaintiffs assert in passing that CHD has standing to sue on behalf of its members, any argument that CHD has associational standing is waived by being raised only in a footnote. *See City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010).  There is simply no assertion that the *Hunt* requirements for associational standing have been met.

Dr. Moynihan and CHD, though, is that Dr. Moynihan is a member of and volunteers for CHD. There are no details besides those indicating how CHD would be impacted by purported restrictions on the speech of its members and volunteers. Indeed, it is unclear what the role of such members and volunteers is within CHD, so we cannot conclude that CHD has shown that it is injured by restrictions on Dr. Moynihan's speech.

Plaintiffs cite no authority for the proposition that the connection between an organization and a member is enough to invoke listener standing under *Mandel*. Indeed, there is far less of a concrete connection between CHD and Dr. Moynihan's speech than was present in *Mandel*. There, the listeners specifically invited the third-party speaker to conferences for the purpose of making speeches and debating and thus suffered an injury when he was not permitted to enter the United States to attend. *See* 408 U.S. at 762–65. The conclusory statements here about the connection between CHD and Dr. Moynihan do not rise to that level.

*Third*, the Plaintiffs assert that they (especially CHD) have been injured for purposes of Claim I because they have an interest in consuming information about COVID-19 that is being suppressed as a result of the Commission's investigations and prosecutions. According to them, such an injury is cognizable based on *Virginia State Board of Pharmacy* and *Murthy*.

We disagree. *Murthy* expressly rejected the argument that it is sufficient for standing to "claim an interest in" another's speech. 603 U.S. at 74. It observed that *Virginia State Board of Pharmacy* fell outside this general rule because in that case "prescription-drug consumers had an

interest in challenging the prohibition on advertising the price of those drugs." *Id.* at 75 (citing *Va. State Bd. of Pharmacy*, 425 U.S. at 755–76). The Plaintiffs frame themselves as "consumers of information" and insist that this is sufficient. But, in doing so, the Plaintiffs overread *Virginia State Board of Pharmacy*, which holds only that consumers of a product can challenge restrictions on the dissemination of information about that product. *See Murthy*, 603 U.S. at 75; *Va. State Bd. of Pharmacy*, 425 U.S. at 755–56.

Moreover, we cannot countenance the Plaintiffs' sweeping theory that an interest in consuming content can form the basis for an injury-in-fact. Accepting that argument would water down the injury-in-fact requirement in First Amendment cases beyond recognition. And it would be at odds with the thrust of *Murthy*, which rejected a similarly broad theory of listener standing. *See* 603 U.S. at 75. Indeed, this case shows the importance of ensuring that ripeness and standing provide guardrails, even in First Amendment cases. At bottom, the Plaintiffs' theory for Claim I is that there is an injury to their right to listen to discourse about COVID-19 from hypothetical future speakers—speakers who may or may not speak, who may or may not be disciplined, who may or may not have their speech chilled, and who may or may not be connected with the Plaintiffs. This is too speculative and non-concrete to satisfy the injury-in-fact requirement.

For those reasons, Claim I is constitutionally unripe because no injury has yet been suffered. It is thus nonjusticiable and was properly dismissed.

## B. Prudential Ripeness

Finally, we turn to the prudential component of ripeness. The district court concluded that none of the Plaintiffs' claims are prudentially ripe and thus must be dismissed. In light of our conclusion that we must abstain from reaching the merits of Claims II, III, and IV as raised by all Plaintiffs and Claim I as raised by Dr. Eggleston and Dr. Siler, we express no opinion as to whether those claims are prudentially ripe. *See Sinochem Int'l*, 549 U.S. at 431; *Potter*, 546 F.3d at 1055. As to Claim I asserted by the remaining Plaintiffs, we agree that that claim is not prudentially ripe, which is an independent basis for dismissal.

At the outset, we first address the Plaintiffs' request that we jettison the doctrine of prudential ripeness. We cannot do as the Plaintiffs ask. The Plaintiffs are correct that "[t]he Supreme Court has stated that the prudential ripeness doctrine is 'in some tension' with 'the principle that "a federal court's obligation to hear and decide" cases within its jurisdiction "is virtually unflagging."'" *Planned Parenthood Great Nw.*, 122 F.4th at 840 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014)). But, as a three-judge panel, we remain bound by our prudential ripeness precedents unless they are "clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). That is a "high standard." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (quoting *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011) (per curiam)). "It is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent[.]" *Id.* (first quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1140–41 (9th

Cir. 2012); then quoting *Delgado-Ramos*, 635 F.3d at 1239 (citations omitted).

Under this standard, the Supreme Court's observation in *Driehaus* does not relieve us of our obligation, as a panel, to follow our prudential ripeness precedents.  Thus, "[b]ecause the Supreme Court 'has not yet had occasion to "resolve the continuing vitality of the prudential ripeness doctrine,"' we apply it [] regardless of any uncertainty about its life expectancy."  *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 751 n.9 (9th Cir. 2020), *as amended* (July 21, 2020) (quoting *Fowler v. Guerin*, 899 F.3d 1112, 1116–18, 1116 n.1 (9th Cir. 2018)).[13]

Having established that the prudential ripeness doctrine remains viable, we turn to whether it is satisfied.  "The prudential ripeness inquiry is 'guided by two overarching considerations: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Project Veritas*, 125 F.4th at 941 (quoting *Bishop Paiute Tribe*, 863 F.3d at 1154).  "The prudential considerations of ripeness are amplified where constitutional issues are concerned."  *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002).

"The fitness prong is met when 'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'"  *Tingley*, 47 F.4th at 1070 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).  "We consider whether the action 'has

---

13 To be sure, considerations of prudential ripeness are discretionary, and we are not obligated to apply them in every case.  *See Bishop Paiute Tribe*, 863 F.3d at 1154.  That does not change the reality that we, as a three-judge panel, lack the power to abolish the doctrine altogether.

a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms.'" *Id.* (quoting *Stormans*, 586 F.3d at 1126).

"Evaluating whether withholding judicial review presents a hardship requires looking at whether the challenged law 'requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.'" *Id.* at 1070–71 (quoting *Stormans*, 586 F.3d at 1126).

Applying these standards, we conclude that Claim I is not prudentially ripe as to Dr. Moynihan, Stockton, or CHD. "[W]e do not decide '"constitutional questions in a vacuum."'" *Thomas*, 220 F.3d at 1141 (quoting *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 511 (9th Cir. 1992)). Unlike Claims II, III, and IV, Claim I involves hypothetical, future prosecutions, largely against unnamed and unknown doctors. In this circumstance, further factual development would not just be helpful; it would be necessary. We do not know what these hypothetical doctors are alleged to have said. Nor do we know what punishments they face. These are strong indicators that the claim is not ripe. *See Thomas*, 220 F.3d at 1141 (concluding that a case "devoid of any specific factual context" and involving no identifiable plaintiffs, was unripe for review).

The same is true with respect to Dr. Moynihan. At this juncture, no proceedings are pending against him, and it is unclear what speech such proceedings would be based upon. Again, further factual development would be needed for us to pass on Dr. Moynihan's Claim I.

Nor is this the kind of case that presents only legal questions. "[B]ringing a First Amendment challenge to a law does not necessarily mean that the issues presented are 'purely legal.'" *Tingley*, 47 F.4th at 1070 (quoting *Thomas*, 220 F.3d at 1142). For instance, in *Thomas*, First Amendment claims centering around hypothetical future tenants were found to depend on further factual development. 220 F.3d at 1142; *accord Tingley*, 47 F.4th at 1070 (suggesting that "claims concerning *future* clients rest upon hypothetical situations with hypothetical clients" and would require further factual development). So too here. The Plaintiffs insist that strict scrutiny is the proper standard to apply. But we cannot apply that standard in the absence of factual context, such as the content of the speech and the nature of the regulation.

Likewise, by its nature, Claim I involves future proceedings that have not yet concluded—or even begun. Thus, this case does not involve "final" action by the Commission. *Tingley*, 47 F.4th at 1070 (quoting *Stormans*, 586 F.3d at 1126). No action has occurred that "has the 'status of law'" and no immediate compliance is required. *See id.* (quoting *Stormans*, 586 F.3d at 1126). In sum, the fitness-of-the-issues prong weighs strongly against this case being considered prudentially ripe.

The hardship issue points the same way. This inquiry "dovetails" with the constitutional ripeness inquiry discussed above. *See Thomas*, 220 F.3d at 1142. For the reasons given above, this case is not constitutionally ripe. And even if Dr. Moynihan had credibly argued that his speech was chilled, *see Wolfson*, 616 F.3d at 1060 (recognizing that self-censorship can give rise to the requisite hardship), that would not change the reality that further factual development is necessary to pass on Claim I.

In sum, even if we were to conclude that it is constitutionally ripe, we would still affirm the dismissal of Claim I as asserted by Dr. Moynihan, Stockton, and CHD, on the ground that it is not prudentially ripe.

## CONCLUSION

The Plaintiffs raise First Amendment and due process challenges to the Washington Medical Commission's investigation and prosecution of doctors who spread COVID-19 misinformation. But we do not resolve those questions today. Claims II, III, and IV of the First Amended Complaint raise challenges to ongoing state proceedings, so *Younger* abstention bars our consideration of those claims. So is Claim I as asserted by Dr. Eggleston and Dr. Siler. As for the remainder of Claim I, which challenges future investigations and prosecutions on behalf of Dr. Moynihan, Stockton, and CHD, that claim is neither constitutionally nor prudentially ripe. As such, the district court did not err in dismissing the First Amended Complaint.

**AFFIRMED.**

---

BRESS, Circuit Judge, concurring in part and concurring in the judgment:

This case involves various claims brought by various plaintiffs concerning the Washington Medical Commission's efforts to discipline doctors for disseminating alleged misinformation related to COVID-19. Part of the difficulty in this case is that the plaintiffs are not all similarly situated, yet all plaintiffs are purporting to bring roughly the same claims. The lack of clear delineation between the

different plaintiffs and claims has complicated the decisional process. Ultimately, I agree with the majority that the plaintiffs' claims cannot move forward, but I disagree in some respects with the majority's reasoning.

The Commission has initiated disciplinary proceedings against Dr. Richard Eggleston and Dr. Thomas T. Siler for professional misconduct based on their writings about COVID-19. These proceedings are taking place before the Commission, but an aggrieved doctor can seek review of an adverse Commission decision in state court. Wash. Rev. Code § 18.130.140. Dr. Eggleston and Dr. Siler are both plaintiffs in this federal lawsuit. Dr. Daniel Moynihan is also a plaintiff in this case. He fears discipline from the Commission for expressing his views on COVID-19, but the Commission has not initiated proceedings against him. The two other named plaintiffs are non-profit organization Children's Health Defense (CHD) and former NBA basketball player John Stockton, who hosts a podcast about COVID-19-related issues.

The operative complaint alleges four claims. The first three claims are brought on behalf of all plaintiffs, and the final claim is brought on behalf of the three doctors only. In Claim 1, plaintiffs seek a declaratory judgment that the Commission's future investigations and "prosecutions" of doctors for spreading alleged misinformation about COVID-19 would violate the First Amendment. In Claim 2, plaintiffs seek a declaratory judgment that the Commission's current investigations and "prosecutions" of doctors for spreading alleged misinformation about COVID-19 violate the First Amendment. In Claim 3, plaintiffs claim that Wash. Rev. Code § 18.130.180(1) and (13), which allows the Commission to punish "moral turpitude, dishonesty, or corruption" of a person's profession (including the medical

profession), as well as fraud and misrepresentation in the conduct of that profession, is overbroad and facially unconstitutional under the First Amendment. Finally, in Claim 4, the doctor plaintiffs allege that the Commission's procedures for disciplining doctors for professional misconduct violate due process.

I agree with majority's resolution of this case in some, but not all, respects, as follows.

## 1. Dr. Eggleston and Dr. Siler

The majority holds that *Younger* abstention, *see Younger v. Harris*, 401 U.S. 37 (1971), precludes Drs. Eggleston and Siler from pursuing Claims 1–4 in federal court, and that no exception to *Younger* applies. I agree. It is obvious why Claim 2—seeking to enjoin ongoing state proceedings, which would include Dr. Eggleston's and Siler's own ongoing state disciplinary proceedings—contravenes *Younger*. Dr. Eggleston's and Dr. Siler's Claim 1 contravenes *Younger* because in seeking to enjoin future disciplinary proceedings against doctors, these plaintiffs effectively seek a court ruling that would enjoin their own ongoing disciplinary proceedings. *See* 17B Wright & Miller, Federal Practice and Procedure § 4252 (3d ed. 2025). And as the majority explains, as to Drs. Eggleston and Siler, Claims 3 and 4 also run afoul of *Younger* because resolving these claims "would have the practical effect of enjoining the state proceedings" involving these same plaintiffs. *Yelp Inc. v. Paxton*, 137 F.4th 944, 951 (9th Cir. 2025) (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)).

2.  Dr. Moynihan

The majority concludes that Dr. Moynihan's Claim 1 fails because he insufficiently preserved that claim on appeal.  I agree that is a sufficient basis for affirming on this claim, and that Dr. Moynihan's pre-enforcement allegations are otherwise inadequately advanced.  A more particularized pre-enforcement challenge may lie in this area, but the one before us is not sufficiently presented and is complicated by the plaintiffs' presentation of the issues, which involve overlapping claims by various plaintiffs.

The majority further holds that *Younger* bars Dr. Moynihan's Claims 2–4.  This is only partially correct. *Younger* does bar Dr. Moynihan's Claim 2, which purports to seek a declaratory judgment that the Commission's current investigations and prosecutions of doctors for spreading alleged misinformation about COVID-19 violate the First Amendment.  Although Dr. Moynihan is not the subject of a pending state court proceeding, he would seek to enjoin ongoing Commission proceedings brought against other doctors (like Drs. Eggleston and Siler).  That is not proper under *Younger*. *See Hicks v. Miranda*, 422 U.S. 332, 349 (1975) (holding that "the same comity considerations apply" under *Younger* "where the interference [with state proceedings] is sought by" people who are "not parties to the state case") (quoting *Allee v. Medrano*, 416 U.S. 802, 831 (1974) (Burger, C.J., concurring)) (brackets omitted).

But I do not think that Dr. Moynihan's Claims 3 and 4 are barred by *Younger*.  As I noted above, Claim 3 seeks to declare facially unconstitutional provisions of Washington law allowing the Commission to punish moral turpitude, dishonesty, corruption, and fraud relating the practice of one's profession.  Wash. Rev. Code § 18.130.180(1) and

(13).  Claim 4 seeks to declare invalid certain Commission practices at the administrative level.  When brought by a plaintiff who is not himself subject to state court proceedings, I do not think these kinds of challenges run afoul of *Younger*.  We have explained that "when the federal plaintiff is not a party to the state court action, a mere commonality of interest with a party to the state litigation is not sufficient to justify abstention." *Green v. City of Tucson*, 255 F.3d 1086, 1100 (9th Cir. 2001).  This is true even when the parties are "represented by common counsel" and have identical challenges to state law. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928–29 (1975).  In the case of claims brought by a plaintiff who is not subject to ongoing state proceedings, we have never held that the possible impact of a successful facial challenge on other extant state proceedings is sufficient to justify *Younger* abstention.  Nor do I see what the majority describes as "unique circumstances" counseling a different approach in this case, based on the way plaintiffs have framed Dr. Moynihan's allegations.

Because Dr. Moynihan's Claims 3 and 4 are not barred by *Younger*, I would resolve them on the merits.  The majority does not address the merits and so I will not address the issue in any detail, except to note that in my view, the facial constitutional challenges in Claims 3 and 4 would fail as a matter of law.[1]

---

1 I would not resolve any of the claims based on prudential ripeness, a discretionary doctrine that need not be invoked when there are other valid bases for dismissal.  *See Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1154 (9th Cir. 2017).  It is not clear the majority needs to reach prudential ripeness either, given that it resolves the various claims on multiple other grounds.

### 3.  CHD and Stockton

These plaintiffs' claims are based on a First Amendment right to listen.  I agree with the majority that as to Claim 1, these plaintiffs lack standing because their claims are too hypothetical, given that they concern unidentified doctors and unidentified speech.  Claim 2, which seeks to use a First Amendment right to listen to enjoin ongoing state disciplinary proceedings, fails under *Younger*, in the same way that Dr. Moynihan's Claim 2 fails.  This makes it unnecessary to evaluate whether the relationships between Stockton and Dr. Eggleston, and CHD and Dr. Moynihan, are sufficient to create standing under *Murthy v. Missouri*, 603 U.S. 43, 75 (2024).  And as to Claim 3, the facial challenge to Wash. Rev. Code § 18.130.180(1) and (13), CHD and Stockton once again lack standing.

In sum, I concur in those portions of the majority opinion consistent with my above analysis, and I otherwise concur in the judgment.